**TWENTIETH CENTURY MUSIC CORPORATION and Mary M. Bourne, Appellees,**

**v.**

**George AIKEN, Appellant.**

**No. 73–1469.**

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1973.

Decided June 21, 1974.

William M. Wycoff, Thorp, Reed & Armstrong, Pittsburgh, Pa., Herman Finkelstein, Gen. Counsel, Bernard Korman, New York City, for appellees.

Thomas N. Dowd, William S. D'Amico, Washington, D. C., Stephen Israel, Pittsburgh, Pa., for appellant.

Melville B. Nimmer, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for amicus curiae Muzak Corp.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

We are concerned here with an interpretation of the Copyright Act, 17 U.S.C. § 1.[1] The District Court for the Western District of Pennsylvania held[2] that defendant infringed two copyrighted musical compositions by performing them at defendant's restaurant publicly for profit.

The question presented for determination may be stated as: has defendant "performed" the plaintiffs' copyrighted musical compositions within the meaning of the Copyright Act, 17 U.S.C. § 1, when these compositions were made available to the defendant's patrons at his restaurant by the instrumentality of a radio and loud speakers?

## I.

The defendant George Aiken owns and operates a fast service food establishment in downtown Pittsburgh. Food is sold at retail for both consumption on the premises and for "take-out" purposes. The premises can accommodate about 40 patrons at its counters and in its booths. A single radio connection to four separate loud speakers furnishes background music through normal radio programming. The speakers are located in the ceiling of the public and non-public areas of the establishment and the defendant's practice (in order to have normal radio broadcasts heard throughout the restaurant during business hours) is to switch the radio on at the opening of each business day. Whatever is broadcast over the radio, therefore,

[1] "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

(a) To print, reprint, publish, copy, and vend the copyrighted work;

(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and

(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced. . . ."

[2] 356 F.Supp. 271 (W.D.Pa.1973); Judgment entered March 26, 1973.

becomes audible in the restaurant, as no effort is made to exclude any portion of the broadcasts, *i. e.*, news, music, commercials, etc.

In accordance with the practice noted above, on March 11, 1972, the radio in the defendant's premises having been turned on, two copyrighted musical compositions were heard by at least six patrons in the restaurant.[3] On that date, radio station WKJF–FM broadcast the two musical selections which were heard at defendant's premises. WKJF–FM at that time was a licensee of The American Society of Composers, Authors and Publishers, (ASCAP) and therefore licensed to broadcast the two songs which formed the basis of the asserted copyright violation. The ASCAP license contained the following provision:

> "Nothing herein contained shall be construed as authorizing Licensee [WKJF–FM] to grant to others any right to reproduce or perform publicly for profit by any means, method or process whatsoever of the musical compositions licensed hereunder or as authorizing any receiver of any radio broadcast to perform publicly or reproduce the same for profit, by any means, method or process whatsoever."

Over the years ASCAP has licensed commercial establishments similar to George Aiken's when the establishment utilizes a radio and more than one speaker. As a matter of policy, however, ASCAP has not required a license where the commercial establishment has limited itself to a radio and one speaker. Presently ASCAP has license agreements with 5,150 businesses.[4] These agreements result in annual royalty payments of $246,000.

Muzak Corporation filed a brief *amicus curiae* in this appeal. Muzak, in its brief, adopted that portion of the District Court's opinion which sets forth Muzak's interest as follows: "The Muzak franchisers sell to business firms 'background' music which is transmitted by wire from a single location within a given geographical area. Muzak is licensed by ASCAP at rates negotiated by the parties or if they are unable to agree, at levels set by the United States District Court for the Southern District of New York in accordance with the consent judgment entered on March 14, 1950[5] . . . . The Muzak organizations compete with FM radio stations for the background music market. A decision adverse to the plaintiff in the case at bar might have an effect on a pending request for reduction of licensing fees which has been filed by Muzak affiliates in the Southern District of New York." Muzak emphasizes that the decision here will "in significant measure influence the price the public pays for background music whatever the source."

The present plaintiffs complain that when George Aiken tuned his restaurant radio to WKJF–FM which was broadcasting plaintiffs' musical compositions, Aiken by that means had publicly performed these compositions for profit

---

3. The two copyrighted musical compositions were: "The More I See You" and "Me and My Shadow". The copyright proprietor of "The More I See You" is the plaintiff-appellee Twentieth Century Music Corporation (hereinafter "Twentieth") ; the copyright proprietor of "Me and My Shadow" is the plaintiff-appellee Bourne. Both Twentieth and Bourne are members of the American Society of Composers, Authors and Publishers (ASCAP), an association authorized to license the right of public performance of the copyrighted musical works in question.

While not directly relevant to the issues discussed in the text of this opinion, as a matter of general nostalgic interest the complaint recites that Mack Gordon and Harry Warren created and wrote "The More I See You", while Billy Rose (lyrics), Al Joelson and Dave Dreyer (music) created and wrote "Me and My Shadow".

4. Included in these businesses are firms which use radio as the source of music, as well as firms which employ on premises sources for music such as tape recorders and live entertainment.

5. The March 14, 1950 consent judgment amended an order dated February 26, 1941, in the case of United States v. American Society of Composers, Authors and Publishers, Civil Action No. 13–95.

within the meaning of the Copyright Act 17 U.S.C. § 1 et seq. The District Court agreed with the plaintiffs' contentions, and although it did not grant the injunction sought, it did enter judgment on March 26, 1973 in favor of each plaintiff for $250. It is that order from which the defendant appeals.

## II.

■ Our task here is to give content and meaning to the term "perform" within the context of the Copyright Act. As Mr. Justice Stewart wrote in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968):

"The Copyright Act does not give a copyright holder control over all uses of his copyrighted work. Instead, § 1 of the Act enumerates several 'rights' that are made 'exclusive' to the holder of the copyright. If a person, without authorization from the copyright holder, puts a copyrighted work to a use within the scope of one of these 'exclusive rights', he infringes the copyright. If he puts the work to a use not enumerated in § 1, he does not infringe."

392 U.S. at 393–395, 88 S.Ct. at 2086.[6]

In each instance, the answer to the question as to whether an infringement occurred depends on whether or not there was a "performance" within the meaning of the Act, since without a "performance" there can be no infringement. The issue was joined here by the plaintiffs asserting that Aiken "performed" the two musical pieces when he switched on his radio (with four loud

speakers attached) and tuned to the station which was playing these compositions. If that act constituted a "performance", then the defendant Aiken infringed the two copyrights and we would then be obliged to affirm the judgment of the District Court. On the other hand, if by the act of tuning to WKJF–FM George Aiken did not "perform", then no infringement occurred and the District Court erred in its opinion and judgment.[7]

The District Court recognized, as do we, that the Act itself does not define "performance". In construing that term the District Court looked primarily to the conflicting tests articulated by the Supreme Court in Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931) (upon which the plaintiffs rely) and to Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), invoked by the defendant.[8]

Our analysis similarly begins with an examination of *Jewell-LaSalle* and *Fortnightly*. However, we need not halt our discussion with *Fortnightly* as the District Court was obliged to do. (*See* fn. 8 *supra*), as we can now draw upon the teaching of Teleprompter Corp. et al. v. Columbia Broadcasting System, Inc., *supra*, as it affects the issue before us.

## III.

### THE PRECEDENTS LEADING TO JEWELL–LaSALLE

Although Herbert v. Shanley Co., 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511 (1917) did not involve a radiocast and obviously not a telecast, it did set the

---

6. "The primary policy of the Copyright Act is to give the public maximum access to the author's work; a secondary purpose is to remunerate the copyright owner." Note, Cable Television and Copyright Royalties, 83 Yale L.J. 554, 557 (1974).

7. Neither the plaintiffs nor the defendant argue with any conviction that the "tuning in" of the radio by the defendant so that it could be heard by patrons in the defendant's restaurant constituted a private as distinct from a public "performance". Nor do they

contend seriously that if such be the case that the "performance" was not for profit.

8. At the time the District Court had this issue before it for resolution, the Supreme Court had not as yet announced its decision in Teleprompter Corp. et al. v. Columbia Broadcasting System, Inc., et al., decided March 4, 1974 and which we discuss at greater length in the latter portions of this opinion. Nos. 72–1628 and 72–1633, 415 U. S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415.

stage for the later copyright cases concerned with "performance". The defendant hotel in *Herbert* employed an orchestra for the entertainment of its guests. During dinner, a copyrighted composition was played. It was held that this was a performance for profit within the meaning of the Copyright Act.

Thereafter in 1925 the unauthorized *broadcasting* of a copyrighted musical composition by a radio station was held to constitute an infringement of the statutory copyright. Jerome H. Remick & Co. v. American Automobile Accessories Co., 5 F.2d 411 (6th Cir. 1925).[9]

In the following year (1926), the concept of "performance" was further refined in Jerome H. Remick & Co. v. General Electric Co., S.D.N.Y., 16 F.2d 829. The District Court in that case posed the question as follows:

> " . . . [W]hether one who by means of the microphones 'picks up' another's unauthorized performance of a copyrighted musical composition and transmits it by radio from a broadcasting station maintained and operated to stimulate the sale of radio product is liable for infringement of copyright."

The District Court found that the only distinction between the defendant's position in *General Electric* and the defendant's position in *American Automobile Accessories* was the fact that the General Electric Co. did not participate in the rendition of the musical production except by affording to others the opportunity to hear it. The Court held that the defendant had infringed the plaintiff's copyright stating:

> " . . . [I]f he [the defendant] broadcasts without authority from the owner of the copyright a private rehearsal of a copyrighted production,

thus converting the private rendition into a public performance for profit, he contributes to the resultant infringement." [10]

Buck v. Debaum, 40 F.2d 734 (S.D. Cal.1929) followed the second *Remick* case. Debaum owned a cafe in Los Angeles. He had installed a radio receiving set through which he received various programs from broadcasting radio stations for the benefit of his patrons. He "tuned in" the cafe radio and in so doing, the copyrighted musical composition "Indian Love Call" was heard in the restaurant. The question there, was whether Debaum had been guilty of infringement of the copyrighted composition. The answer to that question focused (as it does here) on whether Debaum "performed" within the meaning of the Copyright Act. Holding that there had been no "performance" by Debaum, the Court said:

> "One who manually or by human agency merely actuates electrical instrumentalities, whereby inaudible elements that are omnipresent in the air are made audible to persons who are within hearing, does not 'perform' within the meaning of the Copyright Law. The performance in such case takes place in the studio of the broadcasting station, and the operator of the receiving set in effect does nothing more than one would do who opened a window and permitted the strains of music of a passing band to come within the inclosure in which he was located. It is true that it is the voluntary act of the person turning the dial on the receiving set that enables electricity to animate the mechanism so as to make audible within hearing distance of the receiving set that which is disseminated from the broadcasting station and which is 'on the air' by reason of the broadcast,

9. The Court specifically held that the mere fact that radio had not been developed at the time the Copyright Act was enacted, did not exclude radio broadcasts from the scope of the statute.

10. Interestingly, dictum in *General Electric Co.* suggests and anticipates the functional test adopted years later in *Fortnightly*: " . . . Certainly those who listen do not perform, and therefore do not infringe. . . ." 16 F.2d at 829.

but such voluntary action in my opinion is far from 'performing' the copyrighted work. The performance which is licensed as just stated, occurs entirely in the studio of the broadcasting station where the copyrighted musical composition is lawfully used, and the action occurring at the receiving set is simultaneous therewith, and is in no sense a reproduction of the musical composition that is being lawfully performed at the broadcasting studio. The action, play, and use of the copyrighted composition has been completed within the studio."

40 F.2d at 735. The District Court in *Debaum* cited the District Court decision in Buck v. Jewell-LaSalle Realty Co., 32 F.2d 366 (W.D.Mo.1929), as authority for its decision.[11]

It was in this setting and with this background that Buck v. Jewell-LaSalle was decided by the Supreme Court in 1931. The question certified by the Court of Appeals and answered "yes"[12] by the Supreme Court was:

"Do the acts of a hotel proprietor, in making available to his guests, through the instrumentality of a radio receiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, the hearing of a copyrighted musical composition which has been broadcast from a radio transmitting station constitute a performance of such composition within the meaning of 17 U.S.C. Sec. 1(e)?"

283 U.S. at 195–196, 51 S.Ct. at 410. The argument was advanced that the mere act of "receiving" is not an act of "performance" by the one operating the receiving set. However, the Court found:

"There is no difference in substance between the case where a hotel engages an orchestra to furnish the music and that where, by means of the radio set and loudspeakers here employed, it furnishes the same music for the same purpose. In each the music is produced by instrumentalities under its control."[13]

283 U.S. at 201, 51 S.Ct. at 412.

Society of European Stage Authors and Composers, Inc. v. New York Hotel Statler Co., Inc., 19 F.Supp. 1 (S.D.N.Y.1937) followed *Jewell-LaSalle* both in time and in content. It was held there that the hotel had infringed a copyright when it "piped" to its guests' rooms a musical composition broadcast by a commercial radio station. The differences between *Jewell-LaSalle* and *Society* were in the physical arrangements for the receiving of the broadcast. In *Jewell* the programs were reproduced in the public rooms of the hotel as well as in the private guest rooms. In *Society* the master receiving sets of the hotel were connected only with the bedrooms and a guest in a particular room of the Hotel Pennsylvania could turn on the loud speaker and could select either of the two programs received by the two master receiving sets of the hotel. Significantly, in *Society* the broadcast was authorized, but the Court nevertheless held the

11. The authority of *Debaum* was therefore undercut when the Supreme Court in *Jewell-LaSalle* held that the defendant hotel had infringed the copyright by a "performance". Despite criticism by the dissent in *Fortnightly* (392 U.S. at 407, n. 5, 88 S.Ct. 2084), apparently some viability remains in the "authorized vs. unauthorized" broadcast distinction drawn in *Debaum* and referred to in limiting fashion in the *Fortnightly* majority opinion (392 U.S. at 396 n. 18, 88 S.Ct. 2084). *But see* Society of European Stage Authors and Composers v. New York Hotel Statler Co., 19 F.Supp. 1 (S.D.N.Y.1937) discussed in the text of this opinion.

12. 283 U.S. at 202, 51 S.Ct. 410.

13. The defendant Jewell-LaSalle operated the LaSalle Hotel which maintained a master radio receiving set wired to each of the public and private rooms. Loud speakers or head phones were provided to the hotel's guests so that a program received on the master set could be simultaneously heard throughout the building. The plaintiff's copyrighted musical composition was broadcast by a radio station, received by the hotel and made available to its guests. The radio station was not licensed to broadcast the copyrighted work.

plaintiffs' copyright to be infringed, stating:

> "[T]he reproduction by the hotel's master receiving sets of the electric impulses of the broadcast, and their distribution among its rooms so that all who wish may, by turning a knob, listen to the broadcast, is a public performance for profit of the broadcast program, and is made at the hotel's risk insofar as copyrighted musical compositions are concerned."

19 F.Supp. at 5–6.

## IV.

## FORTNIGHTLY CORP. v. UNITED ARTISTS TELEVISION, INC.

The *Jewell-LaSalle* quantitative test [14] to determine "performance'" was thereafter rejected in favor of a "functional" test in *Fortnightly*,[15] at least as regards cable television.

The Fortnightly Corp. owns and operates community antenna television (CATV) systems in two localities in West Virginia. Prior to 1957 there were no local television broadcasting stations in that area. After 1957, when two television stations were established, many residents of the area could still not receive broadcasts with ordinary rooftop antennas. This problem was solved by a number of the householders through utilization of Fortnightly's CATV service,[16] purchased at a flat monthly rate.

United Artists Television, Inc. is the copyright owner of several motion pictures. It granted licenses to the television stations in the West Virginia area to broadcast the motion pictures. Broadcasts were received by Fortnightly's CATV system and thence carried to its customers, despite the lack of authorization for such broadcast by United Artists. Fortnightly was thereupon sued for copyright infringement. United Artists contended and Fortnightly denied that the CATV systems "performed" the copyrighted motion pictures. The Court agreed with Fortnightly that no "performance" resulted from the CATV activities stating:

> "Television viewing results from combined activity by broadcasters and viewers. Both play active and indispensable roles in the process; neither is wholly passive. The broadcaster selects and procures the program to be viewed. He may produce it himself, whether 'live' or with film or tape, or he may obtain it from a network or some other source. He then converts the visible images and audible sounds of the program into electronic signals, and broadcasts the signals at radio frequency for public reception. Members of the public, by means of television sets and antennas that they themselves provide, receive the broadcaster's signals and reconvert them into the visible images and audible sounds of the program. The effective range of the broadcast is determined by the

14. The "quantitative" label stemmed from the quantitative performance standard employed by *Jewell-LaSalle* and the cases which followed it, and can be defined as: "[H]ow much did the [infringer] do to bring about the viewing and hearing of a copyrighted work?" *See* Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. at 396, 88 S.Ct. 2084. *See also* 392 U.S. at 396–397, n. 18, 88 S.Ct. 2084.

15. *Fortnightly* is the first case to apply the Copyright Act to cable television (CATV). A discussion of CATV operations and systems can be found in United States v. Southwestern Cable Co., 392 U.S. 157, 161, 88 S.Ct. 1994, 20 L.Ed.2d 1001 et seq. (1968).

16. The Fortnightly system is described in the opinion as consisting of "antennas located on hills above each city, with connecting coaxial cables, strung on utility poles, to carry the signals received by the antennas to the home television sets of individual subscribers. The systems contain equipment to amplify and modulate the signals received, and to convert them to different frequencies, in order to transmit the signals efficiently while maintaining and improving their strength." 392 U.S. at 392, 88 S.Ct. at 2085. It is also noted in the opinion that some 10% of the CATV systems originate their own programs, but that type of programming was not dealt with by the Court.

combined contribution of the equipment employed by the broadcaster and that supplied by the viewer.

The television broadcaster in one sense does less than the exhibitor of a motion picture or stage play; he supplies his audience not with visible images but only with electronic signals. The viewer conversely does more than a member of a theater audience; he provides the equipment to convert electronic signals into audible sound and visible images. Despite these deviations from the conventional situation contemplated by the framers of the Copyright Act, broadcasters have been judicially treated as exhibitors, and viewers as members of a theater audience. Broadcasters perform. Viewers do not perform. Thus, while both broadcaster and viewer play crucial roles in the total television process, a line is drawn between them. One is treated as active performer; the other, as passive beneficiary.

When CATV is considered in this framework, we conclude that it falls on the viewer's side of the line. Essentially, a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's television set. It is true that a CATV system plays an 'active' role in making reception possible in a given area, but so do ordinary television sets and antennas. CATV equipment is powerful and sophisticated, but the basic function the equipment serves is little different from that served by the equipment generally furnished by a television viewer. If an individual erected an·antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur." (footnotes omitted).

392 U.S. at 397–400, 88 S.Ct. at 2088.

In analyzing "performance," the majority (per Justice Stewart) stated that: " . . . mere quantitative contribution cannot be the proper test . . . . " Instead, the resolution of the issue [of performance in the context of television broadcasting] depends upon a determination of the function that is played by CATV in the overall process of telecasting and reception. Justice Fortas, writing in dissent, took the view that the majority had overruled *Jewell-LaSalle, supra* and *Society of European Stage Authors and Composers, supra.* The majority opinion on the other hand states that " . . . [t]he *Jewell-LaSalle* decision must be understood as limited to its own facts." 392 U.S. at 397 n.18, 88 S.Ct. at 2088. (*See* n.11, *supra*).

## V.

## TELEPROMPTER IN THE SECOND CIRCUIT

Following *Fortnightly*, the Second Circuit in 1973 held that the importation of "distant signals" [17] and their rebroadcast by CATV infringed the copyrighted material broadcasted. Columbia Broadcasting System, Inc. v. Teleprompter Corp., 476 F.2d 338 (2d Cir. 1973). For our purposes, the significance of this decision is the application of the *Fortnightly* functional test in determining

---

17. By means of a high powered antenna, CATV systems pick up radio signals present in the air and through various mechanical means, *see* fn. 16, *supra*, transform them into television pictures and sound. These signals are of two varieties. They may be able to be received within the range of ordinary (local) antennas or they may be "distant signals". "Distant signals" are signals which originate outside of the effective range of ordinary (local) antennas and are only available to the community through the use of CATV systems.

whether this rebroadcasting of "distant signals" constituted a "performance". Applying this test, the Court of Appeals held that no "performance" resulted when CATV systems merely retransmitted signals which were present in the air and within the range of ordinary (local) antennas. It concluded that no copyright liability could be imposed, even though the same programs could not have been received without the aid of CATV. The *Teleprompter* question that was not answered by *Fortnightly* was the question of whether a "performance" resulted when the CATV system distributed signals that originated *beyond* the range of ordinary (local) antennas. In that situation the Second Circuit held that this activity was functionally equivalent to that of a "broadcast" and hence must be deemed to constitute "performance" within the meaning of the Copyright Act. In essence, therefore, *Teleprompter* found no "performance" within the original CATV range but found "performance" where relays were required.

It was in that setting that the District Court here was called upon to determine the instant controversy. On the one hand it was faced with an "all fours" decision in Buck v. Jewell-La-Salle, *supra*. On the other hand, it was faced with a CATV decision (*Fortnightly, supra*) which for all practical purposes rejected the quantitative test of *Jewell-LaSalle* and substituted in its place a functional test. The District Court opted to follow *Jewell-LaSalle*,

holding that Aiken had "performed" within the meaning of the Copyright Act. In applying the quantitative test rather than the functional test, the District Court reasoned that had the Supreme Court intended to overrule *Jewell-LaSalle*, it would have done so expressly. 356 F.Supp. at 274.

## VI.

## TELEPROMPTER IN THE SUPREME COURT

■ Much, if not all, of the force of the District Court's reasoning is dissipated by the Supreme Court's decision in Teleprompter Corp. v. Columbia Broadcasting System, Inc., 415 U.S. 394. 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974).[18] The Supreme Court held, among other things that the relay importation of distant signals does not constitute "performance" under the Copyright Act. It thereby reversed that portion of Columbia Broadcasting System, Inc. v. Teleprompter Corp., *supra* which defined "performance" in terms of "local" and "distant" signals. The Supreme Court also held that "performance" did not result from program origination,[19] sale of commercials or interconnection[20] of CATV systems.

*Teleprompter's* significance in the resolution of the issue before us is fourfold.

*First: Teleprompter* reaffirms the *Fortnightly* functional test.

18. Teleprompter Corp. v. Columbia Broadcasting System, No. 72–1628 was decided together with Columbia Broadcasting System, Inc. v. Teleprompter Corp., No. 72–1633, both on certiorari to the Second Circuit.

19. Program origination was expressly excluded from consideration in *Fortnightly*, 392 U.S. 392 n. 6, 88 S.Ct. 2084.

20. It was argued in *Teleprompter* that many CATV systems originated programs as contrasted with those programs received from broadcasters and rechannelled to subscribers. It was contended that such "original programming" results in a broadcast function

and hence a "performance". Additionally it was argued that *Teleprompter* sells advertising time—a function normally attributed to broadcasters. Finally it was argued that the originating of a program by one CATV system and the sale of the right for redistribution of that program to another CATV system would constitute copyright infringement. These arguments were all rejected by the Supreme Court ". . . in none of these operations is there any nexus with the defendants' reception and rechannelling of the broadcasters' copyrighted materials." [94 S.Ct. at 1136].

*Second:* *Teleprompter*, as did *Fortnightly*, rejects unequivocally the quantitative test of Buck v. Jewell-LaSalle.[21]

*Third*: Despite the arguments advanced respecting (a) program origination; (b) sale of commercials; and (c) interconnection, (*see* n.20 *supra*), CATV systems were nevertheless committed to the "viewer" (as distinct from the "broadcaster") side of the line.

*Fourth*: Despite the advanced technology required for "local" signals (and even more so) for "distant" signals, the Supreme Court nevertheless held the reception and rechannelling of these signals a "viewer" function.

The Supreme Court stated:

"In Fortnightly the Court reasoned that '[i]f an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be "performing" the programs he received on his television set,' 392 U.S., at 400, and concluded that '[t]he only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.' *Ibid.* In the case of importation of 'distant signals,' the function is essentially the same. While the ability or inclination of an individual to erect his own antenna might decrease with respect to distant signals because of the increased cost of bringing the signal to his home, his status as a 'non-performer' would remain unchanged. Similarly, a CATV system does not lose its status as a non-broadcaster, and thus a non-'performer' for copyright purposes, when the signals it carries are those from distant rather than local sources."

\* \* \* \* \* \*

"Moreover, a CATV system importing 'distant' signals does not procure programs and propagate them to the public, since it is not engaged in converting the sights and sounds of an event or a program into electronic signals available to the public. The electronic signals it receives and rechannels have already been 'released to the public' even though they may not be normally available to the specific segment of the public served by the CATV system."

[94 S.Ct. at 1138].

In rejecting still another contention that the importation of "distant" signals should entail copyright infringement liability because of the deleterious impact of such retransmission upon the economics and market structure of copyright licensing, the Court said:

"By extending the range of viewability of a broadcast program, CATV systems thus do not interfere in any traditional sense with the copyright holders' means of extracting recompense for their creativity or labor. When a broadcaster transmits a pro-

---

21. Both appellant and appellees take heart from the fact that *Teleprompter's* majority opinion makes no mention of *Jewell-LaSalle*. The appellant regards this omission as further proof of its contention that *Jewell-LaSalle* has been overruled by *Fortnightly* and hence is no longer a "test", theory or case with which to be concerned. On the other hand, the appellees regard this lack of reference as a sign of continued validity of *Jewell-LaSalle* albeit in a restricted and narrow area. Realizing that we are anticipating our conclusion we nevertheless are obliged to agree with the appellant, that if Buck v. Jewell-LaSalle had retained any viability after *Fortnightly*, that viability no longer exists after the Supreme Court's decision in *Teleprompter*. As Justice Blackmun dissenting in part, stated:

"I was not on the Court when Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), was decided. Were that case presented for the first time today, I would be in full agreement with what Mr. Justice Fortas said in dissent. I would join his unanswered—and, for me, unanswerable—reliance on Mr. Justice Brandeis' unanimous opinion in Buck v. Jewell-LaSalle Realty Corp., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931). But Fortnightly has been decided, and today the Court adheres to the principles it enunciated and to the simplistic basis \* on which it rests." (\* "Broadcasters perform. Viewers do not perform." 392 U.S., at 398 (footnotes omitted).) [94 S.Ct. at 1141].

gram under license from the copyright holder it has no control over the segment of the population which may view the program—the broadcaster cannot beam the program exclusively to the young or to the old, only to women or only to men—but rather he gets paid by advertisers on the basis of all viewers who watch the program. The use of CATV does not significantly alter this situation. Instead of basing advertising fees on the number of viewers within the range of direct transmission plus those who may receive 'local signals' via a CATV system, broadcasters whose reception ranges have been extended by means of 'distant signal' CATV rechanelling will merely have a different and larger viewer market. From the point of view of the broadcasters, such market extension may mark a reallocation of the potential number of viewers each station may reach, a fact of no direct concern under the Copyright Act. From the point of view of the copyright holders, such market changes will mean that the compensation a broadcaster will be willing to pay for the use of copyrighted material will be calculated on the basis of the size of the direct broadcast market augmented by the size of the CATV market.

These shifts in current business and commercial relationships, while of significance with respect to the organization and growth of the communications industry, simply cannot be controlled by means of litigation based on copyright legislation enacted more than half a century ago, when neither broadcast television nor CATV was yet conceived. Detailed regulation of these relationships, and any ultimate resolution of the many sensitive and important problems in this field, must be left to Congress." (footnotes omitted).

[94 S.Ct. at 1140].

Hence not only did the Supreme Court reemphasize the functional test announced in *Fortnightly*, but to the extent that it applied that test to "distant signals" and held that even these did not constitute "performance", it supports the position taken by the appellant here.[22] If Fortnightly, with its elaborate CATV plant and Teleprompter with its even more sophisticated and extended technological and programming facilities were not "performing", then logic dictates that no "performance" resulted when the defendant Aiken merely activated his restaurant radio.

■■ We hold, therefore, that mere extension of the range of audibility[23] of a broadcast program as "extended" here by the appellant Aiken, cannot be said to constitute "performance". The question asked at the outset of this opinion must therefore be answered "no".

The judgment of the District Court will be reversed and the District Court directed to enter judgment for the defendant.

---

22. We find no distinction between the two technologies of radio and CATV which would require us to reach a different result than that reached in *Fortnightly* or *Teleprompter*. Neither of those opinions are limited to television or CATV. Indeed as we have previously noted, *Fortnightly* cited with approval *Buck v. Debaum*, *supra*, and *Debaum* was a "radio" case.

23. *See* Teleprompter Corp. v. Columbia Broadcasting System, Inc., 415 U.S. 394, 94 S.Ct. 1129.