# TWENTIETH CENTURY MUSIC CORP. ET AL. *v.* AIKEN

No. 74–452.  Argued April 21, 1975—Decided June 17, 1975

*Simon H. Rifkind* argued the cause for petitioners.

With him on the briefs were *Herman Finkelstein, Jay H. Topkis,* and *Bernard Korman.*

*Harold David Cohen* argued the cause for respondent. With him on the brief were *Thomas N. Dowd* and *William S. D'Amico.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The question presented by this case is whether the reception of a radio broadcast of a copyrighted musical composition can constitute copyright infringement, when the copyright owner has licensed the broadcaster to perform the composition publicly for profit.

I

The respondent George Aiken owns and operates a small fast-service food shop in downtown Pittsburgh, Pa., known as "George Aiken's Chicken." Some customers carry out the food they purchase, while others remain and eat at counters or booths. Usually the "carry-out" customers are in the restaurant for less than five minutes, and those who eat there seldom remain longer than 10 or 15 minutes.

A radio with outlets to four speakers in the ceiling receives broadcasts of music and other normal radio programing at the restaurant. Aiken usually turns on the radio each morning at the start of business. Music, news, entertainment, and commercial advertising broadcast by radio stations are thus heard by Aiken, his employees, and his customers during the hours that the establishment is open for business.

On March 11, 1972, broadcasts of two copyrighted musical compositions were received on the radio from a

---

*Irwin Karp* filed a brief for the Authors League of America, Inc., as *amicus curiae* urging reversal.

local station while several customers were in Aiken's establishment. Petitioner Twentieth Century Music Corp. owns the copyright on one of these songs, "The More I See You"; petitioner Mary Bourne the copyright on the other, "Me and My Shadow." Petitioners are members of the American Society of Composers, Authors and Publishers (ASCAP), an association that licenses the performing rights of its members to their copyrighted works. The station that broadcast the petitioners' songs was licensed by ASCAP to broadcast them.[1] Aiken, however, did not hold a license from ASCAP.

The petitioners sued Aiken in the United States District Court for the Western District of Pennsylvania to recover for copyright infringement. Their complaint alleged that the radio reception in Aiken's restaurant of the licensed broadcasts infringed their exclusive rights to "perform" their copyrighted works in public for profit. The District Judge agreed, and granted statutory monetary awards for each infringement. 356 F. Supp. 271. The United States Court of Appeals for the Third Circuit reversed that judgment, 500 F. 2d 127, holding that the petitioners' claims against the respondent were foreclosed by this Court's decisions in *Fortnightly Corp.* v. *United Artists*, 392 U. S. 390, and *Teleprompter Corp.* v.

---

[1] For a discussion of ASCAP, see *K-91, Inc.* v. *Gershwin Publishing Corp.*, 372 F. 2d 1 (CA9).

ASCAP's license agreement with the Pittsburgh broadcasting station contained, as is customary, the following provision:

"Nothing herein contained shall be construed as authorizing LICENSEE [WKJF-FM] to grant to others any right to reproduce or perform publicly for profit by any means, method or process whatsoever, any of the musical compositions licensed hereunder or as authorizing any receiver of any radio broadcast to perform publicly or reproduce the same for profit, by any means, method or process whatsoever."

*CBS,* 415 U. S. 394. We granted certiorari. 419 U. S. 1067.

## II

The Copyright Act of 1909, 35 Stat. 1075, as amended, 17 U. S. C. § 1 *et seq.*,[2] gives to a copyright holder a monopoly limited to specified "exclusive" rights in his copyrighted works.[3] As the Court explained in *Fortnightly Corp.* v. *United Artists, supra:*

"The Copyright Act does not give a copyright

---

[2] The Constitution gives Congress the power: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U. S. Const., Art. I, § 8, cl. 8. See, *e. g., Burrow-Giles Lithographic Co.* v. *Sarony,* 111 U. S. 53, 58; *Trade-Mark Cases,* 100 U. S. 82, 94.

[3] Title 17 U. S. C. § 1 provides in part:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

"(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

"(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not

holder control over all uses of his copyrighted work. Instead, § 1 of the Act enumerates several 'rights' that are made 'exclusive' to the holder of the copyright. If a person, without authorization from the copyright holder, puts a copyrighted work to a use within the scope of one of these 'exclusive rights,' he infringes the copyright. If he puts the work to a use not enumerated in § 1, he does not infringe." 392 U. S., at 393–395.

Accordingly, if an unlicensed use of a copyrighted work does not conflict with an "exclusive" right conferred by the statute, it is no infringement of the holder's rights. No license is required by the Copyright Act, for example, to sing a copyrighted lyric in the shower.[4]

---

aware that he was infringing and that such infringement could not have been reasonably foreseen; and

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce or reproduce it in any manner or by any method whatsoever; and

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced . . . ."

[4] Cf. *Wall* v. *Taylor*, 11 Q. B. D. 102, 106–107 (1883) (Brett, M. R.): "Singing for one's own gratification without intending thereby to represent anything, or to amuse any one else, would not, I think, be either a representation or performance, according to the ordinary meaning of those terms, nor would the fact of some other person being in the room at the time of such singing make it so . . . ."

The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution,[5] reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.[6] The immediate effect of our copyright law is to secure a fair return for an "author's" creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good. "The sole interest of the United States and the primary object in conferring the monopoly," this Court has said, "lie in the general benefits derived by the public from the labors of authors." *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 127. See *Kendall* v. *Winsor,* 21 How. 322, 327–328; *Grant* v. *Raymond,* 6 Pet. 218, 241–242. When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.[7]

---

[5] See 1 M. Nimmer, Copyright § 5 (1974).

[6] Lord Mansfield's statement of the problem almost 200 years ago in *Sayre* v. *Moore,* quoted in a footnote to *Cary* v. *Longman,* 1 East *358, 362 n. (b), 102 Eng. Rep. 138, 140 n. (b) (1801), bears repeating:

"[W]e must take care to guard against two extremes equally prejudicial; the one, that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labour; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded."

[7] In *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390, the Court stated:

"[O]ur inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here. In 1909 radio itself was in its infancy, and television had not been

The precise statutory issue in the present case is whether Aiken infringed upon the petitioners' exclusive right, under the Copyright Act of 1909, 17 U. S. C. § 1 (e), "[t]o perform the copyrighted work publicly for profit." [8] We may assume that the radio reception of the musical compositions in Aiken's restaurant occurred "publicly for profit." See *Herbert v. Shanley Co.*, 242 U. S. 591. The dispositive question, therefore, is whether this radio reception constituted a "performance" of the copyrighted works.

When this statutory provision was enacted in 1909, its purpose was to prohibit unauthorized performances of copyrighted musical compositions in such public places as concert halls, theaters, restaurants, and cabarets. See H. R. Rep. No. 2222, 60th Cong., 2d Sess. (1909). An orchestra or individual instrumentalist or singer who performs a copyrighted musical composition in such a public place without a license is thus clearly an infringer under the statute. The entrepreneur who sponsors such a public performance for profit is also an infringer— direct or contributory. See generally 1 & 2 M. Nimmer, Copyright §§ 102, 134 (1974). But it was never contemplated that the members of the audience who heard the composition would themselves also be simultaneously "performing," and thus also guilty of infringement. This much is common ground.

With the advent of commercial radio, a broadcast musical composition could be heard instantaneously by an enormous audience of distant and separate persons operating their radio receiving sets to reconvert the broad-

---

invented. We must read the statutory language of 60 years ago in the light of drastic technological change." *Id.*, at 395–396 (footnotes omitted).

[8] See n. 3, *supra*.

cast to audible form.[9]  Although Congress did not revise
the statutory language, copyright law was quick to adapt
to prevent the exploitation of protected works through
the new electronic technology.  In short, it was soon
established in the federal courts that the broadcast of a
copyrighted musical composition by a commercial radio
station was a public performance of that composition
for profit—and thus an infringement of the copyright
if not licensed.  In one of the earliest cases so holding,
the Court of Appeals for the Sixth Circuit said:

> "While the fact that the radio was not developed
> at the time the Copyright Act . . . was enacted
> may raise some question as to whether it properly
> comes within the purview of the statute, it is not
> by that fact alone excluded from the statute.  In
> other words, the statute may be applied to new situ-
> ations not anticipated by Congress, if, fairly con-
> strued, such situations come within its intent and
> meaning. . . .  While statutes should not be
> stretched to apply to new situations not fairly within
> their scope, they should not be so narrowly con-
> strued as to permit their evasion because of chang-
> ing habits due to new inventions and discoveries.

> .        .        .        .        .

> "A performance, in our judgment, is no less public
> because the listeners are unable to communicate
> with one another, or are not assembled within an
> inclosure, or gathered together in some open stadium
> or park or other public place.  Nor can a perform-
> ance, in our judgment, be deemed private because
> each listener may enjoy it alone in the privacy of

---

[9] Station KDKA, established in Pittsburgh in 1920, is said to
have been the first commercial radio broadcasting station in the
world.  See *Buck* v. *Jewell-LaSalle Realty Co.*, 283 U. S. 191, 196
n. 2.

his home. Radio broadcasting is intended to, and in fact does, reach a very much larger number of the public at the moment of the rendition than any other medium of performance. The artist is consciously addressing a great, though unseen and widely scattered, audience, and is therefore participating in a public performance." *Jerome H. Remick & Co.* v. *American Automobile Accessories Co.*, 5 F. 2d 411, 411–412.

See also *M. Witmark & Sons* v. *L. Bamberger & Co.*, 291 F. 776 (NJ); *Jerome H. Remick & Co.* v. *General Electric Co.*, 4 F. 2d 160 (SDNY); *Jerome H. Remick & Co.* v. *General Electric Co.*, 16 F. 2d 829 (SDNY); *Associated Music Publishers, Inc.* v. *Debs Memorial Radio Fund*, 141 F. 2d 852 (CA2). Cf. *Chappell & Co., Ltd.* v. *Associated Radio Co. of Australia, Ltd.*, [1925] Vict. L. R. 350; *Messager* v. *British Broadcasting Co., Ltd.*, [1927] 2 K. B. 543, rev'd on other grounds, [1928] 1 K. B. 660, aff'd, [1929] A. C. 151. See generally Caldwell, The Broadcasting of Copyrighted Works, 1 J. Air L. 584 (1930); Note, 75 U. Pa. L. Rev. 549 (1927); Note, 39 Harv. L. Rev. 269 (1925).

If, by analogy to a live performance in a concert hall or cabaret, a radio station "performs" a musical composition when it broadcasts it, the same analogy would seem to require the conclusion that those who listen to the broadcast through the use of radio receivers do not perform the composition. And that is exactly what the early federal cases held. "Certainly those who listen do not perform, and therefore do not infringe." *Jerome H. Remick & Co.* v. *General Electric Co., supra,* at 829. "One who manually or by human agency merely actuates electrical instrumentalities, whereby inaudible elements that are omnipresent in the air are made audible to persons who are within hearing, does not 'perform'

within the meaning of the Copyright Law." *Buck* v. *Debaum,* 40 F. 2d 734, 735 (SD Cal. 1929).

Such was the state of the law when this Court in 1931 decided *Buck* v. *Jewell-LaSalle Realty Co.,* 283 U. S. 191. In that case the Court was called upon to answer the following question certified by the Court of Appeals for the Eighth Circuit: "Do the acts of a hotel proprietor, in making available to his guests, through the instrumentality of a radio receiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, the hearing of a copyrighted musical composition which has been broadcast from a radio transmitting station, constitute a performance of such composition within the meaning of 17 USC Sec. 1 (e)?" The Court answered the certified question in the affirmative. In stating the facts of the case, however, the Court's opinion made clear that the broadcaster of the musical composition was not licensed to perform it, and at least twice in the course of its opinion the Court indicated that the answer to the certified question might have been different if the broadcast itself had been authorized by the copyright holder.[10]

We may assume for present purposes that the *Jewel-LaSalle* decision retains authoritative force in a factual situation like that in which it arose.[11] But, as the Court of Appeals in this case perceived, this Court has in two

---

[10] "[W]e have no occasion to determine under what circumstances a broadcaster will be held to be a performer, *or the effect upon others of his paying a license fee."* 283 U. S., at 198 (emphasis added). See also *id.,* at 199 n. 5.

[11] The decision in *Jewell-LaSalle* might be supported by a concept akin to that of contributory infringement, even though there was no relationship between the broadcaster and the hotel company and, therefore, technically no question of actual contributory infringement in that case. *Id.,* at 197 n. 4.

recent decisions explicitly disavowed the view that the reception of an electronic broadcast can constitute a performance, when the broadcaster himself is licensed to perform the copyrighted material that he broadcasts. *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390; *Teleprompter Corp.* v. *CBS,* 415 U. S. 394.

The language of the Court's opinion in the *Fortnightly* case could hardly be more explicitly dispositive of the question now before us:

> "The television broadcaster in one sense does less than the exhibitor of a motion picture or stage play; he supplies his audience not with visible images but only with electronic signals. The viewer conversely does more than a member of a theater audience; he provides the equipment to convert electronic signals into audible sound and visible images. Despite these deviations from the conventional situation contemplated by the framers of the Copyright Act, broadcasters have been judicially treated as exhibitors, and viewers as members of a theater audience. Broadcasters perform. Viewers do not perform. Thus, while both broadcaster and viewer play crucial roles in the total television process, a line is drawn between them. One is treated as active performer; the other, as passive beneficiary." 392 U. S., at 398–399 (footnotes omitted).

The *Fortnightly* and *Teleprompter* cases, to be sure, involved television, not radio, and the copyrighted materials there in issue were literary and dramatic works, not musical compositions. But, as the Court of Appeals correctly observed: "[I]f Fortnightly, with its elaborate CATV plant and Teleprompter with its even more sophisticated and extended technological and programming facilities were not 'performing,' then logic dictates that no 'performance' resulted when the [respond-

ent] merely activated his restaurant radio." 500 F. 2d, at 137.

To hold in this case that the respondent Aiken "performed" the petitioners' copyrighted works would thus require us to overrule two very recent decisions of this Court. But such a holding would more than offend the principles of *stare decisis;* it would result in a regime of copyright law that would be both wholly unenforceable and highly inequitable.

The practical unenforceability of a ruling that all of those in Aiken's position are copyright infringers is self-evident. One has only to consider the countless business establishments in this country with radio or television sets on their premises—bars, beauty shops, cafeterias, car washes, dentists' offices, and drive-ins—to realize the total futility of any evenhanded effort on the part of copyright holders to license even a substantial percentage of them.[12]

And a ruling that a radio listener "performs" every broadcast that he receives would be highly inequitable for two distinct reasons. First, a person in Aiken's position would have no sure way of protecting himself from liability for copyright infringement except by keeping his radio set turned off. For even if he secured a license from ASCAP, he would have no way of either foreseeing or controlling the broadcast of compositions whose copyright was held by someone else.[13] Secondly, to hold that

---

[12] The Court of Appeals observed that ASCAP now has license agreements with some 5,150 business establishments in the whole country, 500 F. 2d 127, 129, noting that these include "firms which employ on premises sources for music such as tape recorders and live entertainment." *Id.,* at 129 n. 4. As a matter of so-called "policy" or "practice," we are told, ASCAP has not even tried to exact licensing agreements from commercial establishments whose radios have only a single speaker.

[13] This inequity, in the context of the decision in *Buck* v. *Jewell-*

all in Aiken's position "performed" these musical compositions would be to authorize the sale of an untold number of licenses for what is basically a single public rendition of a copyrighted work. The exaction of such multiple tribute would go far beyond what is required for the economic protection of copyright owners,[14] and would be wholly at odds with the balanced congressional purpose behind 17 U. S. C. § 1 (e):

> "The main object to be desired in expanding copyright protection accorded to music has been to give to the composer an adequate return for the value of

---

*LaSalle Realty Co.,* 283 U. S. 191, was pointed out by Professor Zechariah Chafee, Jr., 30 years ago:

"A rule which is very hard for laymen to apply so as to keep clear of litigation was established by the *La Salle Hotel* case. The hotel was heavily liable if it rebroadcast unlicensed music, but how could it protect itself? Must it maintain a monitor always on the job to sit with a list before him pages long showing what pieces are licensed and turn off the master set the instant an unlicensed piece comes from the broadcasting station? The dilemma thus created by the Copyright Act was mitigated for a time by the machinery of ASCAP, which was a device entirely outside the statute. The hotel could obtain a blanket license from ASCAP and thus be pretty sure of safety about all the music which came through its master set. . . . [But if] any composer outside of ASCAP has his music broadcast, what is the hotel to do? Besides getting an ASCAP license, must the hotel bargain separately with every independent composer on the chance that his music may come through to the hotel patrons?

"Such divergences from the ideal . . . are likely to be corrected . . . ." Reflections on the Law of Copyright: I, 45 Col. L. Rev. 503, 528–529.

[14] The petitioners have not demonstrated that they cannot receive from a broadcaster adequate royalties based upon the total size of the broadcaster's audience. On the contrary, the respondent points out that generally copyright holders can and do receive royalties in proportion to advertising revenues of licensed broadcasters, and a broadcaster's advertising revenues reflect the total number of its listeners, including those who listen to the broadcasts in public business establishments.

his composition, and it has been a serious and a difficult task to combine the protection of the composer with the protection of the public, and to so frame an act that it would accomplish the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monopolies, which might be founded upon the very rights granted to the composer for the purpose of protecting his interests." H. R. Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909).

For the reasons stated in this opinion, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring in the result.

My discomfort, now decisionally outdated to be sure, with the Court's opinion and judgment is threefold:

1. My first discomfort is factual. Respondent Aiken hardly was an innocent "listener," as the Court seems to characterize him throughout its opinion and particularly *ante,* at 162. In one sense, of course, he was a listener, for as he operated his small food shop and served his customers, he heard the broadcasts himself. Perhaps his work was made more enjoyable by the soothing and entertaining effects of the music. With this aspect I would have no difficulty.

But respondent Aiken installed four loudspeakers in his small shop. This, obviously, was not done for his personal use and contentment so that he might hear the broadcast, in any corner he might be, above the noise of commercial transactions. It was done for the entertainment and edification of his customers. It was part of what Mr. Aiken offered his trade, and it added, in his estimation, to the atmosphere and attraction of his estab-

lishment. Viewed in this light, respondent is something more than a mere listener and is not so simply to be categorized.

2. My second discomfort is precedential. Forty-four years ago, in a unanimous opinion written by Mr. Justice Brandeis, this Court held that a hotel proprietor's use of a radio receiving set and loudspeakers for the entertainment of hotel guests constituted a performance within the meaning of § 1 of the Copyright Act, 17 U. S. C. § 1. *Buck* v. *Jewell-LaSalle Realty Co.,* 283 U. S. 191 (1931). For more than 35 years the rule in *Jewell-LaSalle* was a benchmark in copyright law and was the foundation of a significant portion of the rather elaborate licensing agreements that evolved with the developing media technology. Seven years ago the Court, by a 5–1 vote, and with three Justices not participating, held that a community antenna television (CATV) station that transmitted copyrighted works to home subscribers was not performing the works, within the meaning of § 1 of the Copyright Act. *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390 (1968). The divided Court only briefly noted the relevance of *Jewell-LaSalle* and announced that that decision "must be understood as limited to its own facts." *Id.,* at 396–397, n. 18. I have already indicated my disagreement with the reasoning of *Fortnightly* and my conviction that it, rather than *Jewell-LaSalle,* is the case that should be limited to its facts. *Teleprompter Corp.* v. *CBS,* 415 U. S. 394, 415 (1974) (dissenting opinion.) I was there concerned about the Court's simplistic view of television's complications, a view perhaps encouraged by the obvious inadequacies of an ancient copyright Act for today's technology. A majority of the Court, however, felt otherwise and extended the simplistic analysis rejected in *Jewell-LaSalle,* but embraced in *Fortnightly,* to even more complex arrangements in the CATV industry. *Teleprompter Corp.* v. *CBS, supra.*

I had hoped, secondarily, that the reasoning of *Fortnightly* and *Teleprompter* would be limited to CATV. At least in that context the two decisions had the arguably desirable effect of protecting an infant industry from a premature death. Today, however, the Court extends *Fortnightly* and *Teleprompter* into radio broadcasting, effectively overrules *Jewell-LaSalle,* and thereby abrogates more than 40 years of established business practices. I would limit the application of *Teleprompter* and *Fortnightly* to the peculiar industry that spawned them. Parenthetically, it is of interest to note that this is precisely the result that would be achieved by virtually all versions of proposed revisions of the Copyright Act. See, *e. g.,* § 101 of S. 1361, 93d Cong., 2d Sess., which sought to amend 17 U. S. C. § 110 (5). See also §§ 48 (5) and (6) of the British Copyright Act of 1956, 4 & 5 Eliz. 2, c. 74, which distinguishes between the use of a radio in a public place and "the causing of a work or other subject-matter to be transmitted to subscribers to a diffusion service."

Resolution of these difficult problems and the fashioning of a more modern statute are to be expected from the Congress. In any event, for now, the Court seems content to continue with its simplistic approach and to accompany it with a pragmatic reliance on the "practical unenforceability," *ante,* at 162, of the copyright law against persons such as George Aiken.

3. My third discomfort is tactical. I cannot understand why the Court is so reluctant to do directly what it obviously is doing indirectly, namely, to overrule *Jewell-LaSalle.* Of course, in my view, that decision was correct at the time it was decided, and I would regard it as good law today under the identical statute and with identical broadcasting. But, as I have noted, the Court

in *Fortnightly* limited *Jewell-LaSalle* "to its own facts," and in *Teleprompter* ignored its existence completely by refusing even to cite it. This means, it seems to me, that the Court did not want to overrule it, but nevertheless did not agree with it and felt, hopefully, that perhaps it would not bother us anymore anyway. Today the Court does much the same thing again by extracting and discovering great significance in the fact that the broadcaster in *Jewell-LaSalle* was not licensed to perform the composition. I cannot join the Court's intimation, *ante,* at 160—surely stretched to the breaking point—that Mr. Justice Brandeis and the unanimous Court for which he spoke would have reached a contrary conclusion in *Jewell-LaSalle* in 1931 had that broadcaster been licensed. The Court dances around *Jewell-LaSalle,* as indeed it must, for it is potent opposing precedent for the present case and stands stalwart against respondent Aiken's position. I think we should be realistic and forthright and, if *Jewell-LaSalle* is in the way, overrule it.

Although I dissented in *Teleprompter,* that case and *Fortnightly,* before it, have been decided. With the Court insisting on adhering to the rationale of those cases, the result reached by the Court of Appeals and by this Court is compelled. Accepting the precedent of those cases, I concur in the result.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE DOUGLAS joins, dissenting.

In *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390, 402 (1968), Mr. Justice Fortas observed that cases such as this call "not for the judgment of Solomon but for the dexterity of Houdini." There can be no really satisfactory solution to the problem presented here, until Congress acts in response to longstanding proposals. My primary purpose in writing is not merely to express

disagreement with the Court but to underscore what has repeatedly been stated by others as to the need for legislative action. Radio today is certainly a more commonplace and universally understood technological innovation than CATV, for example, yet we are, basically, in essentially the same awkward situation as in the past when confronted with these problems. We must attempt to apply a statute designed for another era to a situation in which Congress has never affirmatively manifested its view concerning the competing policy considerations involved.

Yet, the issue presented can only be resolved appropriately by the Congress; perhaps it will find the result which the Court reaches today a practical and equitable resolution, or perhaps it will find this "functional analysis"[1] too simplistic an approach, cf. *Teleprompter Corp.* v. *CBS,* 415 U. S. 394, 415 (1974) (BLACKMUN, J., dissenting), and opt for another solution.

The result reached by the Court is not compelled by the language of the statute; it is contrary to the applicable case law and, even assuming the correctness and relevance of the CATV cases, *Fortnightly, supra,* and *Teleprompter, supra,* it is not analytically dictated by those cases. In such a situation, I suggest, "the fact that the Copyright Act was written in a different day, for different factual situations, should lead us to tread cautiously here. Our major object . . . should be to do as little damage as possible to traditional copyright principles and to business relationships, until the Congress legislates and relieves the embarrassment which we and the interested parties face." *Fortnightly, supra,* at 404 (Fortas, J., dissenting).

As the Court's opinion notes, *ante,* at 160, in *Buck* v.

---

[1] "Broadcasters perform. Viewers do not perform." *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390, 398 (1968) (footnotes omitted).

*Jewell-LaSalle Realty Co.*, 283 U. S. 191 (1931), answering a precisely phrased certified question, the Court construed the Copyright Act in a manner which squarely conflicts with what is held today. Congress, despite many opportunities, has never legislatively overruled *Buck, supra.* It was not overruled in *Fortnightly* but treated "as limited to its own facts." 392 U. S., at 396–397, n. 18. Even assuming the correctness of this dubious process of limitation, see *Fortnightly, supra,* at 405 (Fortas, J., dissenting); *Teleprompter, supra,* at 415 (BLACKMUN, J., dissenting), *Buck* is squarely relevant here since the license at issue expressly negated any right on the part of the broadcaster to further license performances by those who commercially receive and distribute broadcast music. Moreover, even accepting, *arguendo,* the restrictive reading given to *Buck* by the Court today, and assuming the correctness of *Fortnightly* and *Teleprompter* in the CATV field, it is not at all clear that the analysis of these latter cases supports the result here.[2] Respondent was more than a "passive beneficiary." *Fortnightly, supra,* at 399. He took the transmission and used that transmission for commercial entertainment in his own profit enterprise, through a multispeaker audio system specifically designed for his business purposes.[3] In short, this case does not call for what the

---

[2] Recent congressional proposals have treated the present problem distinctly from CATV questions. See, *e. g.,* S. 1361, 93d Cong., 2d Sess. (1974). See also British Copyright Act of 1956, §§ 48 (5), (6), 4 & 5 Eliz. 2, c. 74.

[3] Indeed, in its consideration of S. 1361, the Senate Committee on the Judiciary undertook to distinguish use of "ordinary radios" from situations "where broadcasts are transmitted to substantial audiences by means of loudspeakers covering a wide area." S. Rep. No. 93–983, p. 130 (1974). The value of this distinction, without drawing a line on the number of outlets that would be exempt is at best dubious; this version leaves the obvious gap in the statute to be filled in by the courts.

Court describes as "a ruling that a radio listener 'performs' every broadcast that he receives . . . ," *ante,* at 162. Here, respondent received the transmission and then put it to an independent commercial use. His conduct seems to me controlled by *Buck*'s unequivocal holding that:

> "One who hires an orchestra for a public performance for profit is not relieved from a charge of infringement merely because he does not select the particular program to be played. Similarly, when he tunes in on a broadcasting station, for his own commercial purposes, he necessarily assumes the risk that in so doing he may infringe the performing rights of another." 283 U. S., at 198–199.

See also *Herbert* v. *Shanley Co.,* 242 U. S. 591 (1917).

In short, as MR. JUSTICE DOUGLAS observed in the *Teleprompter* case: "The Court can read the result it achieves today only by 'legislating' important features of the Copyright Act out of existence." 415 U. S., at 421. In my view, we should bear in mind that "[o]ur ax, being a rule of law, must cut straight, sharp, and deep; and perhaps this is a situation that calls for the compromise of theory and for the architectural improvisation which only legislation can accomplish." *Fortnightly, supra,* at 408 (Fortas, J., dissenting).