**George Godfrey RODRIGUE, Jr.**

v.

**Veronica Hidalgo RODRIGUE.**

**Civil Action No. 95–2862.**

United States District Court, E.D. Louisiana.

Feb. 12, 1999.

**536**

Alfred S. Lippman, Lippman, Mahfouz & Martin, Morgan City, LA, Marc David Winsberg, Halpern, Danner & Winsberg, LLC, Metairie, LA, Cynthia LeBourgeois, Lafayette, LA, Charles Dean Domingue, Robert Lawrence Waddell, Domingue, Delaune & Waddell, Lafayette., LA, Kyle D. Schonekas, Patrick S. McGoey, Schonekas, Evans & McGoey, LLC, New Orleans, LA, for George G. Rodrigue, Jr.

Monica Tufano, Surprenant, Dennis Martin Laborde, Baldwin & Haspel, LLC, New Orleans, LA, Dane S. Ciolino, Loyola Law School, New Orleans, LA, for Richard Steiner.

Robert E. Barkley, Jr., Mark Powell Seyler, Barkley & Thompson, LC, New Orleans, LA, Diane Sorola, Lafayette, LA, Warren Allan Goldstein, New Orleans, LA, for Veronica Hidalgo Rodigue.

### ORDER AND REASONS

LEMMON, District Judge.

**IT IS HEREBY ORDERED** that George Rodrigue's Motion for Summary Judgment on the Issue of Federal Copyright Law Preemption (document # 96) is **GRANTED** and Veronica Hidalgo Rodrigue's Motion for Summary Judgment (document # 92) is **DENIED.**

### Background

George Rodrigue and Veronica Hidalgo, were married in 1967 and lived together under Louisiana's community property regime until their divorce in 1994. Termi-nation of the marital community was effective June 9, 1993. George is an artist who created numerous paintings during and after the existence of the community, some for which George obtained certificates of copyright.

The matter is before the court on cross motions for summary judgment. Veronica claims that, by operation of Louisiana community property law and in accordance with 17 U.S.C. § 201(d), she is a co-owner of all copyrights that arose during the community and is therefore entitled to an accounting for George's use of certain recurring images [1] which, after the dissolution of the community, continue to be thematically expressed in George's paintings.

George argues that (1) he is the sole "author" of all art work; (2) under 17 U.S.C. § 201(a), the author is vested initially with title to the copyrights on each work; (3) under § 106, the owner has the right to prepare derivative works based on the copyrighted works; and (4) Veronica, therefore, has no interest in the recurring images. Veronica contends that a one-half interest in the copyrights was transferred to her by operation of community property law in accordance with 17 U.S.C. § 201(d). George concedes that Veronica is entitled to an accounting for the artworks produced during the existence of the community, and he contends that he has adequately compensated her for her interest in these works. However, George denies that Veronica has any interest in his continued use of the copyrighted recurring images.

George asserts that there is an irreconcilable conflict between copyright law and community property law with respect to both initial vesting of the copyright and any alleged transfer, and therefore Louisiana community property law is preempted by federal copyright law. George contends that after the copyrights vested in him initially under federal law, there was

---

**1.** Veronica has limited her request for relief to a declaration of her rights with respect to the "Blue Dog" and "Jolie Blonde" images.

no subsequent transfer of the copyrights, or any interest in them, to Veronica because: (1) no provision of Louisiana community property law authorizes such a transfer; and (2) such an involuntary transfer is prohibited by 17 U.S.C. § 201(e). Veronica contends that the application of community property law does not pose any conflict with federal copyright law because federal law contemplates that, after vesting initially in the author, copyrights can be transferred by operation of law, and because application of community property law does not stand as an obstacle to the purposes of federal copyright law.

### Discussion

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir.1991); Fed.R.Civ.P. 56(c). If the moving party carries the initial burden of establishing there is no genuine issue of fact, the burden shifts to the non-moving party to produce evidence of the existence

of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmovant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

### Preemption

The threshold issue of this case is whether and to what extent United States copyright law conflicts with and therefore preempts Louisiana community property law.[2] This court must decide whether it is possible to comply with both federal copyright law and Louisiana community property law, and whether the application of Louisiana community property law is an obstacle to the goals of copyright law.

 When state and federal law clash, federal law prevails. U.S. Const. Art. VI, cl.2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ...."); *Ridgway v. Ridgway*, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981). "[T]he question whether a certain state action is preempted by federal law is one of con-

**2.** The only reported case on this subject concluded, with little analysis, that the Copyright Act does not preempt community property law. The California Court of Appeals addressed the question of preemption of community property law in *In re Marriage of Worth*, 195 Cal.App.3d 768, 241 Cal.Rptr. 135 (1987). Frederick L. Worth authored two trivia encyclopedias during his marriage. Two years after he divorced his wife, Worth filed a federal copyright infringement suit against the makers of Trivial Pursuit, the board game. His ex-wife obtained a state court order declaring that she was entitled to half of any recovery from the infringement suit. Worth appealed; however, his appeal became moot when the federal district and appellate courts rejected his infringement suit. The California Court of Appeal nonetheless considered the ex-wife's case on the grounds that the petition for certiorari in the infringement case was still pending. The Court of Appeal addressed the issue of the ownership of the copyright in the trivia books and concluded that state community property

laws are not preempted by the Copyright Act. Most commentators repudiate *Worth*. *See* 1 Melville Nimmer and David Nimmer, *Nimmer on Copyright* § 6A.03[C] and n.50 (1992); Debra Polacheck, *The 'Un–Worth–y' Decision: The Characterization of a Copyright as Community Property*, 17 Hastings Comm./Ent. L.J. 601 (1995); Carla M. Roberts, *Worthy of Rejection; Copyright as Community Property*, 100 Yale L.J. 1053 (1991). *See also* Francis M. Nevins, Jr., *When an Author's Marriage Dies: The Copyright—Divorce Connection*, 37 J. Copr. Soc'y U.S.A. 382 (1990); David Nimmer, *Copyright Ownership by the Marital Community*, 36 U.C.L.A.L.R. 383 (1988); Peter J. Wong, *Asserting the Spouse's Community Property Rights in Copyright*, 31 Idaho L.Rev. 1087 (1995); Michael J. Perlstein, *Copyright as Community Property; Questions About Worth Are More Than Trivial*, 9 No. 11 Ent. L. Rep. 3 (1988). *Cf. also* William Patry, *Copyright and Community Property: The Question of Preemption*, 28 Bull. Copr. Soc'y U.S.A. 237 (1981) (a pre-*Worth* article).

gressional intent." *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 112 S.Ct. 2374, 2381, 120 L.Ed.2d 73 (1992) (internal quotation and citation omitted) (Illinois regulation impliedly preempted as in conflict with purposes and objectives of Occupational Safety and Health Act). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Id.* "Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* 112 S.Ct. at 2383. "[A] federal statute implicitly overrides state law either when the scope of the statute indicates that Congress intended federal law to occupy a field exclusively or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995) (internal citations omitted) (National Traffic and Motor Vehicle Safety Act did not preempt state common law claims). The Supreme Court has also "found implied conflict preemption where it is impossible for a private party to comply with both state and federal requirements and execution of the full purposes and objectives of Congress." *Id.* (internal quotations and citations omitted.)

■ Historically, however, all legal issues relating to families have been the exclusive province of state law not federal law. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979). When there is conflict between state family law and federal law, state law is not lightly set aside. *Id.* Preemption of state law may be necessary when Congress has positively required preemption by direct enactment. *Id.* However, a "mere conflict in words" between federal law and state family and family property law is not sufficient grounds for overturning state law.

*Id.* Rather, "family property law must do 'major damage' to 'clear and substantial' federal interests" before state law is overridden. *Id.* Under the test described in *Hisquierdo,* in order for federal law to preempt state family law, (1) there must be some sort of express conflict between the two; and (2) the state law must do "major damage" to "clear and substantial" federal interests. *Id.*

### Preemption of Community Property Laws in Other Contexts

The United States Supreme Court has held that community property law is preempted in some instances where it affects a federally created property right. In *Hisquierdo,* the Court, relying on the preemptive effect of the Railroad Retirement Act's anti-alienation provision, 45 U.S.C. § 231m, held that benefits arising during marriage and payable to covered railroad workers under that act were not community property subject to division upon divorce. *Hisquierdo,* 99 S.Ct. at 809–810. Similarly, in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), the Court held that military retirement pay was separate property because the federal military retirement scheme preempted state community property laws. Federal savings bonds regulations were held to preempt state community property laws in *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). *See also, Yiatchos v. Yiatchos,* 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964) (also addressing the preemptive effect of savings bonds regulation.) In *Ridgway v. Ridgway,* 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981), the Court held that federal rules concerning military life insurance benefits preempted state law.[3] More recently, in *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997), the Court held, by a 5–4 margin, that ERISA preempted Louisiana's com-

**3.** The preempted state law was a Massachusetts court order rather than a community

property law. *Ridgway,* 102 S.Ct. at 52.

munity property law when a non-partici-pant spouse attempted a testamentary dis-position of undistributed pension benefits.

Community property law has not fared well in preemption battles before the Su-preme Court. Congress, however, has leg-islatively overruled the holdings in *McCar-ty* and *Hisquierdo* by making railroad and military retirement benefits subject to community property law. *See* 45 U.S.C. § 231m (amended 1983) and 10 U.S.C. § 1408(c)(1)(amendment effective retroac-tively as of the day of the *McCarty* deci-sion). "Typically, the federal government has operated within a traditional common law property background in drafting its regulations and has often precluded appli-cation of community property principles within those regulations. Recent develop-ments with federal pensions, however, in-dicate a growing respect for state commu-nity property laws .... The United States Supreme Court was not receptive to state community property policies in deciding that federal retirement plans would be the separate benefits of the covered employ-ees. Congress, however, reversed those decisions and provided for the application of state community property laws in signif-icant areas." Katherine S. Spaht & W. Lee Hargrave, 16 *Louisiana Civil Law Treatise,* Matrimonial Regimes, § 3.40, 3.45 (2d ed. 1997) ("Spaht & Hargrave").

### Community Property Law and Copy-right Law

Community property law is a venerable product of the civil law based on the "real partnership" between husband and wife in marriage. *Boggs,* 117 S.Ct. at 1760. Loui-siana's community property law is one of the most deeply rooted community proper-ty regimes in the nation, tracing its roots to Louisiana's days as a Spanish and French colony. Spaht & Hargrave, § 1.1. *See also* William Patry, *Copyright and*

*Community Property; The Question of Preemption,* 28 Bull. Copr. Soc'y U.S.A. 237 (1981) ("Patry"); David Nimmer, *Copyright Ownership by the Marital Com-munity,* 36 U.C.L.A.L.R. 383, 384, n.2 (1988) ("Nimmer Article"). Fundamental to Louisiana's community property regime is the principle that property acquired dur-ing the existence of the marital community "through the effort, skill, or industry of either spouse" is community property in which each spouse owns an undivided one-half interest. La. Civ.Code arts. 2336 and 2338. Under Louisiana law, the recurring images in the art works created during the marriage would be community property as products of the "effort, skill, or industry" of a spouse. La. Civ.Code art. 2338. *See also Worth,* 241 Cal.Rptr. at 136–37.

Federal copyright law arises from Arti-cle I, § 8, cl.8 of the U.S. Constitution which empowers Congress:

> To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the ex-clusive Right to their respective Writ-ings and Discoveries ....

U.S. Const. Art. I § 8, cl.8.[4]

A copyright is a federally created and regulated form of property consisting of rights arising from creation of an original work. These rights include the right to copy and distribute the work, to prepare derivative works, and to display the works. 17 U.S.C. § 106.

The Congressional intent behind the grant of patents and copyrights is to en-courage individual effort by personal gain in order to advance the public welfare through the talents of authors and inven-tors. *See Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). "Creative work is to be encouraged and

---

**4.** While at least one commentator regards the monopoly grant and public good as almost competing or at least counterbalancing, Peter J. Wong, *Asserting the Spouse's Community Property Rights in Copyright,* 31 Idaho L.Rev. 1087, 1090–92 (1995), a better view is that the

monopoly grant is the *means* chosen by the Framers and Congress to promote the public good. It is for Congress to determine where the author's monopoly and the public good might diverge.

rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and other arts." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975). Another goal is to maintain a single national standard to permit copyrighted works to be exchanged efficiently. *See* 1 Melville Nimmer and David Nimmer, *Nimmer on Copyright* § 1.01[A] (1992) ("Nimmer Treatise"). "[F]ederal copyright laws ensure 'predictability and certainty of copyright ownership,' 'promote national uniformity' and 'avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States.'" *In re Peregrine Entertainment, Ltd.,* 116 B.R. 194, 199 (C.D.Cal.1990) (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). "One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property. See The Federalist No. 43, p. 309 (B. Wright ed.1961)". *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 983, 103 L.Ed.2d 118 (1989). *See also* 17 U.S.C. § 301; *Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811.[5] *Cf. also Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (objective of copyright clause in Constitution was to facilitate granting of rights "national in scope").

### Scope of Express Preemption by the Act

■ Section 301 of the current Copyright Act, enacted in 1976, ("the Act") expressly provides for preemption of state copyright law and provides that all state-created rights, including statutory or common law rights, that are "equivalent" to any of the rights specified by the Act "are governed exclusively by this title." The Act limits express preemption to matters provided for by sections 102 (original works protected by copyright), 103 (compilations and derivative works) and 106 (exclusive rights in copyrighted works). 17 U.S.C. § 301. There is no blanket express preemption of state property laws under § 301; the federal scheme simply is not so all-pervasive that there is no room for state activity in this area. *Cf. Bonito Boats,* 109 S.Ct. at 986. For example, state mortgage and succession laws may apply simultaneously with copyright law. 17 U.S.C. §§ 101 ("transfer of copyright ownership") and 201(d)(1); Nimmer Treatise, § 10.05A. In addition, the validity of some transfers may be determined by reference to state contract laws, provided that the minimum requirements of 17 U.S.C. § 204 are met.[6] *See, e.g., N & D E Co. v. Gustings,* 1992 WL 77581 (E.D.La. 1992), 1992 WL 77581. *Cf. also Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973)(a pre-Act case where a California criminal statute prohibiting "record pirating" was held not to be preempted by federal copyright law). On its face, § 301 does not expressly preempt community property law because community property law does not necessarily purport to provide rights "equivalent" to those specified by the Act. However, there are specific areas of potential conflict between the Act and Louisiana community property law that result in preemption.

### Initial Ownership of the Copyright

■ The critical point of friction between the Act and community property law concerns initial ownership of the copyright. The Act provides: "Copyright . . .

---

5. In *Reid,* which concerned the issue of when a work was "made for hire," the Court held that agency issues should be resolved under general common law concepts rather than under state law because "the Act is expressly intended to create a federal law of uniform, nationwide application by broadly preempting state statutory and common-law copyright regulation." *Reid,* 109 S.Ct. at 2173.

6. 17 U.S.C. § 204(a) requires that a transfer other than by operation of law must be in writing and signed by the owner of the rights conveyed.

vests initially in the author ...." 17 U.S.C. § 201. In contrast, Louisiana law provides that property acquired during the existence of the community regime is owned by both spouses in indivision. La. Civ.Code art. 2338. *Cf. Worth*, 241 Cal. Rptr. at 137. These provisions clash head-on.[7]

■ "Copyright in a work created on or after January 1, 1978 subsists from its creation ...." 17 U.S.C. 302(a). A work is "created" when it is "fixed in a copy ... for the first time ... [W]here a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101. A copyright comes into existence as soon as an "original"[8] work is "fixed in any tangible medium of expression" (as opposed to a not-yet-manifested idea that is not copyrightable). 17 U.S.C. § 102. Consequently, a copyright attaches in favor of the author at each step of creation—each word, musical note or brush stroke—from the first expression of the work. Ownership cannot vest simultaneously in both the author alone and in the community. Community property law may not defeat the clearly expressed intention of Congress by attributing copyright ownership to a non-author at the time of creation. Any community property ownership provision, such as Article 2338, that permits copyright ownership to vest initially in anyone other than the author is therefore preempted.[9] This view is consistent with the Constitutional provision allowing "to Authors ... the exclusive Right ...." Article 2338 not only literally conflicts with the Act (under part one of the *Hisquierdo* test), it does major damage to the substantial federal interest in providing exclusive rights to authors. Consequently, a copyright is separate property of the author spouse upon its creation.[10]

### Transfer of Copyright Ownership

■ While ownership of a copyright vests initially in the author and thus comes into existence as the author's separate property, the Act allows for ownership of a copyright to be transferred by contract or "by operation of law." 17 U.S.C. § 201(d). Veronica asserts that ownership of the copyrights was transferred to the community "by operation of law" immediately after vesting in George upon creation of the works. This argument carried the day in *Worth*, 241 Cal.Rptr. at 137, and scholars and commentators aware of the progressive nature and benefits of community property law promote this transfer theory as a means of creating a "unified thoroughfare that can accommodate the basic purposes of [copyright law and community property law] ... respecting the rights both of authors protected under copyright law and of spouses protected as part of the marital community." Nimmer Article, 36

7. In the rare case of true co-authorship by both spouses, no such clash exists. 17 U.S.C. § 201(a).

8. The "originality" threshold is quite low; it is only necessary that the work be "independently created by the author and possesses some minimal degree of creativity." *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). Plaintiff's paintings are clearly "original".

9. Even though the community acquires no interest in the copyright, the community acquires the thing that is copyrighted—the paintings. *See* 17 U.S.C. § 202.

10. In addition granting a non-author spouse a copyright interest might run afoul of copyright termination/renewal law with respect to surviving spouses. *See* Nimmer Article, 36 U.C.L.A.L.R. at 403–04; Nimmer Treatise, §§ 9.02. The Act specifically addresses the rights of surviving spouses. 17 U.S.C. § 203(a). To the extent community property-based co-ownership would give a spouse greater rights while the author lives than the spouse would have after the author's death, it would be preempted as inconsistent with copyright law. Nimmer Article, 36 U.C.L.A.L.R. at 403, n.101.

U.C.L.A.L.R. at 385; Patry, 28 Bull. Copr. Soc'y U.S.A. at 272; Peter J. Wong, *Asserting the Spouse's Community Property Rights in Copyright,* 31 Idaho L.Rev. 1087, 1101–02 (1995) ("Wong"). The transfer theory purports to allow the community to obtain though an infinitesimal passage of time what it is prohibited from doing at the copyright's inception.

Congress has prohibited the involuntary transfer of a copyright except in specific circumstances. Section 201(e) of the Act provides in part:

> When an individual author's ownership of a copyright ... has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright ... shall be given effect under this title, except as provided under title 11.

Section 201(e) was originally intended to prevent the Soviet Union from squelching dissidents by confiscating their copyrights, but the plain language of the section prohibits involuntary transfer by any government action. *See* Francis M. Nevins, Jr., *When an Author's Marriage Dies; The Copyright -Divorce Connection,* 37 J. Copr. Soc'y U.S.A. 382, 383–84 (1990); Nimmer Treatise at §§ 6A.03[C][2][b] & 10.04. The official comments to § 201(e) say:

> The purpose of this subsection is to reaffirm the basic principle that the United States copyright of an individual author shall be secured to that author, and cannot be taken away by *any involuntary transfer.* It is the intent of the subsection that the author be entitled, despite any purported expropriation or involuntary transfer, to continue exercising all rights under the United States statute, and that the governmental body or organization may not *enforce or exercise any rights* under this title in that situation.
>
> \* \* \* \* \* \*

Traditional legal actions that may involve transfer of ownership, such as bankruptcy proceedings and mortgage foreclosures, are not within the scope of this subsection; the authors in such cases have voluntarily consented to these legal processes by their overt actions—for example, by filing in bankruptcy or by hypothecating a copyright.

> 1978 Acts. Senate Report No. 95–989 and House Report No. 95–595, see 1978 U.S.Code Cong. and Adm. News, p. 5787.

(Emphasis added.)

■ Most commentators agree that § 201(e) prohibits any involuntary transfer by operation of law. Nimmer Treatise at §§ 6A.03[C][2][b] & 10.04; Nevins, 37 J. Copr. Soc'y U.S.A. at 383–84; Wong, 31 Idaho L.Rev. at 1101. This reading is supported by the comments to the Act in which Congress expressed an intention to deem some otherwise apparently involuntary transfers—bankruptcy and hypothecation—to be voluntary. In addition, the express mention in § 201(e) of the exception "provided by title 11" suggests a broad prohibition against enforcement of involuntary transfers in all other circumstances.

However, one court has construed § 201(e)

> as dealing with actions initiated by governmental bodies, not with those where ... the instruments of government are merely acting in furtherance of private objectives.... [T]his section has no application to governmental actions taken in the sphere of private law *where the government is merely enforcing private rights and is not the ultimate beneficiary.*

*In re Peregrine Entertainment, Ltd.,* 116 B.R. 194, 206, n. 16 (C.D.Cal.1990) (emphasis added) (upholding the validity of state law encumbrances on copyrights). In addition, one commentator has criticized § 201(e) as (1) unnecessary; (2) "a new

departure from long-established principles of individual freedom"; (3) a principle "by no means basic to copyright or to American jurisprudence," considering that involuntary transfers "take a wide variety of forms under domestic law"; and (4) based on the flawed assumption "that voluntary transfers can be easily distinguished." Paul Goldstein, *Preempted State Doctrines, Involuntary Transfers and Compulsory Licenses; Testing the Limits of Copyright,* 24 U.C.L.A.L.R. 1107, 1124–25 (1977) ("Goldstein").

The reasoning of the *Peregrine* court is somewhat persuasive in light of the acknowledged original legislative intent to prevent totalitarian governments from expropriating dissidents' copyrights. Also compelling are criticisms of § 201(e) as ill advised and unnecessary. Goldstein, 24 U.C.L.A.L.R. at 1124–25. However, the plain language of § 201(e) and the comments—which specifically forbid a governmental entity from "enforc[ing] or exercis[ing] any rights"—suggest that a broad reading is correct and that § 201(e) precludes any involuntary transfer of a copyright from the author to the community. Section 201(e) thus qualifies the provision for transfers "by operation of law" by requiring that "such operation of law must be triggered by the express or implied consent of the author." Nimmer Treatise § 10.04 & n.8 (citing *Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y.1991)).

Consequently, in order for George to have transferred his copyrights, which the Act declares his separate property, to the community, he must have done so voluntarily. *See* Nimmer Treatise at § 6A.03[C][2][b] ("Absent such consent ... *Worth*'s holding cannot comply with the Copyright Act, and hence would be clearly preempted.") *See also* Patry, 28

Bull. Copr. Soc'y U.S.A. at 267. Some commentators (and Veronica) suggest that George implicitly made a voluntary transfer of his copyrights by creating copyrighted works while married and living under Louisiana's community property regime. Nimmer Treatise, § 6A.03[C][2][b]; Wong, 31 Idaho L.Rev. at 1102; Patry, 28 Bull. Copr. Soc'y U.S.A. at 268–69. This "constructive voluntariness" argument is bolstered by recognizing the fact that George and Veronica could have opted out of Louisiana's community property regime either before or during their marriage (though deviating from the community regime during the marriage would have required judicial participation). La. Civ.Code arts. 2328 and 2329.[11]

There is little support in the body of copyright law for the concept of implied voluntariness. In a work-made-for-hire situation, the employee's acceptance of employment is deemed to be consent to the employer's ownership of copyrights in works created by the employee. 17 U.S.C. § 201(b). But the Act treats the work-made-for-hire issue as one of authorship and not of transfer of rights; the employer is presumed to be the author initially and not by virtue of a post-creation transfer. *Id.* In addition, Congress itself expressly provided in the Act for this type of quasi-assignment of authorship, whereas spousal co-author or quasi-assignee fictions have no textual basis. Patry, 28 Bull. Copr. Soc'y U.S.A. at 249. Further, none of the theoretical underpinnings of the work-made-for hire doctrine are present in the community property context. *Id.* Unlike the employee in the work-made-for hire situation, the author does not produce his work for the non-author spouse or under her direction; the author is not paid by the non-author spouse for his work; and the

---

**11.** In Louisiana, couples have the option of entering a community property regime or a separate property regime. La. Civ.Code art. 2328 provides:

A matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal

regime. Spouses are free to establish by matrimonial agreement a regime of separation of property or modify the legal regime as provided by law. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect.

non-author spouse does not bear business costs and risks and thus should not reap the gain. *Id.* (discussing underpinnings of work-made-for-hire).

Louisiana's community property law provides no better theoretical basis for implied donations of separate property to the community. A copyright begins its existence as the author's separate property due to the preemptive effect of § 102 of the Act. The preempted Article 2338 merely defines community property, but does not operate to transfer separate property from a spouse to the community. On the other hand, La. Civ.Code art. 2343.1 [12] does provide that a spouse may transfer separate property to the other spouse "with a stipulation that it shall be part of the community." *Id.* Such a transfer with a stipulation "transforms the thing into community property." *Id.* However such "a transfer by onerous title must be made in writing and a transfer by gratuitous title must be made by authentic act." *Id. See Succession of Davis,* 496 So.2d 549 (La.App. 1 Cir.1986) (where transfer of immovable property was found not to have been donated to the community). In this case, there has been no transfer in writing or by authentic act. On the contrary, George expressed his intention *not* to donate his separate property to the community when he registered the copyrights of his works for copyright protection, thus creating a rebuttable presumption of copyright ownership. 17 U.S.C. § 410; *See, e.g., M.H. Segan Limited Partnership v. Hasbro, Inc.,* 924 F.Supp. 512 (S.D.N.Y. 1996) (certificate is prima facie evidence of copyright ownership).

To make the "implied voluntary transfer by operation of law" theory fly in light of the contrary indications of both copyright law and community property law, the transfer would have to occur somehow instantaneously with the creation of the copyright. Patry, in his insightful pre-*Worth* article, suggests that "we could assume that Congress was aware that copyright would vest equally in an author and his or her non-author spouse in the community property states, and, by not providing to the contrary, impliedly approved of a joint authorship fiction." Patry, 28 Bull. Copr. Soc'y U.S.A. at 247. As an alternative, Patry suggests we assume that "Congress was aware of the vesting of equal rights in community property states, and by its silence allowed an implied assignment of a one-half interest to the non-author spouse by operation of the community property laws." *Id.* Patry likens these fictions to the quasi-assignment "fiction indulged in out of convenience and simplicity" in a work-made-for hire situation. *Id.* at 248 (internal quotations and citations omitted). Nonetheless, unlike the work-made-for-hire situation, there is no textual support nor any theoretical justification for this fiction, a point Patry concedes. *Id.* at 248–49.

To conclude that entering into a community property regime constitutes implied consent to the transfer of copyright ownership would require the court to ignore a variety of additional issues: the author's actual intent, possible disincentives to the author to create, inconsistencies that might arise in other jurisdictions, whether community property states or not, and the problems that could arise in a mobile society if the author and spouse move to a community property state. Such structure and balancing of rights is best left to the legislative branch of government.

One major policy consideration to be addressed by the legislative process would be the complex problem of the copyright management rights of co-owners. The creation of a new and unique class of co-owners would require third-party licensees

---

**12.** The transfer by a spouse to the other spouse of a thing forming part of his separate property, with the stipulation that it shall be part of the community, transforms the thing into community property. As to both movables and immovables, a transfer by onerous title must be made in writing and a transfer by gratuitous title must be made by authentic act. La. Civ.Code art. 2343.1

and transferees to determine whether an author were subject to community property rules. The existence of numerous co-owners whose ownership rights are determined by state community property management rules would be contrary to the goal of national uniformity. Federal copyright law is intended to enhance predictability and certainty of copyright ownership, promote national uniformity and avoid the practical difficulties of determining and enforcing an author's rights under the differing state laws. *See Reid,* 109 S.Ct. at 2177. If community property law were to govern the rights of non-author spouses, there would be different management rules for each community property state and another for the rest of the nation. Indeed, there would be different sets of rules for co-owners within each state— one for those who co-own through community property laws, and one for other co-owners[13]. Nimmer Treatise, § 6A.02[C]. The presence of competing management rules "threatens chaos for both the copyright creative and consuming communities. Rival grantees may claim from a husband and wife; the resolution of their claims could turn on whether uniform federal standards should govern, or on where the spouses were domiciled, or on what the pertinent provisions of California, or New Mexico, or Louisiana law provide. Such a Balkanization of copyright transfers would benefit no one—not the grantees of copyrights, not the author-spouses, and ultimately not even the nonauthor-spouses." *Id.* (footnotes omitted). *Cf. also* Roberts,

---

**13.** The Copyright Act is silent as to the management rights of copyright co-owners; those rights have been formulated through common law jurisprudence. *See generally* Nimmer Treatise, Ch. 6, "Co-ownership of Copyright". Despite the absence of controlling statutes, there is no reason to believe that Congress intended the issue of co-owners' rights to be left to the fifty states. Nimmer Article, 36 U.C.L.A.L.R. at 410. Federal law treats copyright co-owners as common law "tenants-in-common" with each owning an undivided interest in the whole copyright. *See* Nimmer Treatise, § 6.09; Robert A. Gorman, *Copyright Law,* 48 (Federal Judicial Center 1991). Co-owners under federal law may "exercise all of the exclusive rights set forth in section 106 of the Act, or to license other persons to exercise those rights; but there is a duty to account to all other co-owners for their share of the proceeds of authorized exploitation." Gorman, *Copyright Law* at p.48. Generally speaking, "a joint owner may, without obtaining the consent of the other joint owners, either exploit the work himself, or grant a nonexclusive license to third parties." Nimmer Treatise, § 6.10, n.3. "Under the federal standard, both co-owners must agree to execute an exclusive license." Debra Polacheck, *The 'Un–Worth–y' Decision: The Characterization of a Copyright as Community Property,* 17 Hastings Comm./Ent. L.J. 601, 627–28(1995); Nimmer Treatise at §§ 6.10–.11; Carla M. Roberts, *Worthy of Rejection; Copyright as Community Property,* 100 Yale L.J. 1053, 1055(1991).

By contrast, Louisiana community property law provides generally for equal management of community property. "Each spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law." La. Civ.Code art. 2346. Under equal management principles, the non-author spouse could sell the copyright without the consent of the author, and even despite the author's objections and the purchaser's knowledge of the author's objection. *See* Spaht & Hargrave at § 5.3. A non-author spouse could apparently grant an exclusive license without the knowledge of the author, and at the risk to third parties negotiating with the author.

Equal management may also inhibit an author's ability to market the copyright, thereby defeating the Act's purpose in promoting creativity by allowing a limited monopoly. *See* Wong, 31 Idaho L.Rev. at 1108; Michael J. Perlstein, *Copyright as Community Property; Questions About Worth Are More Than Trivial,* 9 No. 11 Ent. L. Rep. 3 (Apr.1988); Roberts, 100 Yale L.J. at 1062–63. For example, a non-author spouse with equal management rights could thwart the author's chosen means of exploitation of a work by granting an exclusive license to one transferee, thereby depriving the author of any opportunity to grant a similar license. The non-author's grant of an nonexclusive license could diminish the value of another non-exclusive grant by the author. *See* Roberts, 100 Yale L.J. at 1062–64. "Any scheme that lessens the possibility of [the author's effective] exploitation not only harms both the author and the non-author spouse, but also undermines Congress' purpose in enacting the copyright laws: to encourage authorship." Nimmer Article, 36 U.C.L.A.L.R. at 412.

100 Yale L.J at 1065–72 (addressing management and control problems under a Commerce Clause analysis and arguing that allowing different rules for community property states and the rest of the nation would violate the Commerce Clause).

Congress may determine that community property law and copyright law are best served when the author spouse retains sole management and control of the copyright while the non-author spouse shares only in the more tangible benefits. Nimmer Article, 36 U.C.L.A.L.R. at 412; Patry, 28 Bull. Copr. Soc'y U.S.A. at 271.[14] Equal sharing of the proceeds of the copyright sufficiently satisfies the prime goal of community property law by recognizing the non-author spouse's overall contribution to earning power of the community. Allowing the author spouse to retain control over the copyright protects third-parties from uncertainty of title and avoids threats to national uniformity that arise from diverse management schemes. *Cf.* Spaht & Hargrave, § 3.34, p.132 (Noting the desirability of "(1) equitable sharing of the products of labor; [and] (2) no management

complications or harm to the interests of third persons."). Author management protects the author's ability to exploit the work and thus minimizes any disincentive to create. Sole management is a means of preserving "the rights of authors' spouses while not impinging on the authors' ability effectively to exploit their copyrights." Nimmer Treatise, § 6A.04.[15]

### Conclusion

Successfully crafting the harmonious convergence of community property and copyright laws is not appropriate for a court of law. As Nimmer observed in response to the *Worth* decision over 20 years ago, harmonization of copyright law and community property may be "evanescent," and construing an appropriate copyright transfer concept would require some "imagination." Nimmer Article, 36 U.C.L.A.L.R. at 385. Even the advocates of treating a copyright as community property concede that a legislative remedy is to be preferred. Nimmer Article, 36 U.C.L.A.L.R. at 411, n.137; Patry, 28 Bull.

---

14. Nimmer proposes simply to grant the author spouse sole, unfettered control over the copyright. *See* Nimmer Article, 36 U.C.L.A.L.R. at 414. The proposed vehicle for this approach is the constructive consent of the non-author spouse to absolute management by the author spouse. *Id.* The author's consent to designate the copyright as community property would be contingent upon the non-author spouse's ceding complete control over the copyright to the author spouse. *Id.* at 414–15.

Another alternative is to treat co-owning spouses the same as other co-owners under federal copyright law. This approach would foster national uniformity, but would not improve the situation of third-parties. Nimmer calls this approach "a prescription for the worst disorder," primarily because it would retroactively transmute existing exclusive licenses into non-exclusive ones. *Id.* It would also work against preserving "the rights of authors' spouses while not impinging on the authors' ability to effectively exploit their copyrights." *Id.*

15. Louisiana's community property regime does provide some methods for sole management by the author spouse.

Civil Code article 2350 provides: "The spouse who is the sole manager of a community enterprises has the exclusive right to alienate, encumber, or lease its movables unless the movables are issued in the name of the other spouse or the concurrence of the other spouse is required by law." Assuming that George's painting efforts are a community enterprise and that George is the sole manager, Veronica's concurrence in management would be still required if the granting of a license or some other copyright transaction were considered the alienation or encumbrance of "all or substantially all of the assets of a community enterprise." La. Civ.Code art 2347 (requiring concurrence of both spouses for such a transaction).

Civil Code article 2351 provides: "A spouse has the exclusive right to alienate, manage, encumber, or lease movables issued or registered in his name as provided by law." *See also* Spaht & Hargrave § 5.7. Article 2351 would address the problem only when the author spouse has registered a copyright pursuant to § 410 of the Act. Equal management rules would still apply to unregistered copyrights.

Copr. Soc'y U.S.A. at 272. The court agrees.

Perhaps there can be a stressless interface between copyright law and community property law. There is no irreconcilable conflict between fundamental goals of spousal equality and protection of the author's monopoly. For example, the basic aim of community property law is served by allowing non-author spouses to enjoy their share of the value of copyrights, even absent equal management rights. The goals of national uniformity and the protection of authors' rights to exploit their copyrights are protected by allowing authors alone the right of management, even though it be at the expense of equal management. At present, however, the conflict between Louisiana's community property law and the Act is irreconcilable. To deem copyrights to be community property would risk inflicting major damage on the Act's goals of predictability and certainty of copyright ownership, national uniformity, and avoidance of the practical difficulties of determining and enforcing an author's rights under the differing laws of the various states.

Harmonization of these policy goals is properly the product of legislative deliberation and compromise. "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987). Congress has responded to court rulings insulating other areas of federally created property rights by providing for the rights of community property spouses. Perhaps it will make similar allowances in the area of copyright law.

The Copyright Act as written preempts Louisiana community property law on the question of ownership of copyrights, and George is the sole owner of the copyrights. Accordingly, George Rodrigue is entitled to summary judgment declaring that federal copyright law preempts Louisiana community property law. George Rodrigue's motion for summary judgment is GRANTED and Veronica Hidalgo Rodrigue's motion for summary judgment is DENIED.