Justice Breyer,
with whom Justice Alito joins,
dissenting.
In order “[t]o promote the Progress of Science” (by which term the Founders meant “learning” or “knowledge”), the Constitution’s Copyright Clause grants Congress the power *345 to “seeur[e] for limited Times to Authors . . . the exclusive Right to their ... Writings.” Art. I, § 8, cl. 8. This “exclusive Right” allows its holder to charge a fee to those who wish to use a copyrighted work, and the ability to charge that fee encourages the production of new material. In this sense, a copyright is, in Macaulay’s words, a “tax on readers for the purpose of giving a bounty to writers” — a bounty designed to encourage new production. As the Court said in Eldred, “‘[t]he economic philosophy behind the [Copyright] [CJlause ... is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors.’ ” Eldred v. Ashcroft, 537 U. S. 186, 212, n. 18 (2003) (quoting Mazer v. Stein, 347 U. S. 201, 219 (1954)). See T. Macaulay, Speeches on Copyright 25 (E. Miller ed. 1913); E. Walterscheid, The Nature of the Intellectual Property Clause: A Study in Historical Perspective 125-126 (2002) (hereinafter Walterscheid).
The statute before us, however, does not encourage anyone to produce a single new work. By definition, it bestows monetary rewards only on owners of old works — works that have already been created and already are in the American public domain. At the same time, the statute inhibits the dissemination of those works, foreign works published abroad after 1923, of which there are many millions, including films, works of art, innumerable photographs, and, of course, books — books that (in the absence of the statute) would assume their rightful places in computer-accessible databases, spreading knowledge throughout the world. See infra, at 354-357. In my view, the Copyright Clause does not authorize Congress to enact this statute. And I consequently dissent.
I
The possibility of eliciting new production is, and always has been, an essential precondition for American copyright protection. The Constitution’s words, “exclusive Right,” *346 “limited Times,” “Progress of Science,” viewed through the lens of history underscore the legal significance of what the Court in Eldred, referred to as the “economic philosophy behind the Copyright Clause.” 537 U. S., at 212, n. 18 (brackets omitted). That philosophy understands copyright’s grants of limited monopoly privileges to authors as private benefits that are conferred for a public reason — to elicit new creation.
Yet, as the Founders recognized, monopoly is a two-edged sword. On the one hand, it can encourage production of new works. In the absence of copyright protection, anyone might freely copy the products of an author’s creative labor, appropriating the benefits without incurring the non-repeatable costs of creation, thereby deterring authors from exerting themselves in the first place. On the other hand, copyright tends to restrict the dissemination (and use) of works once produced either because the absence of competition translates directly into higher consumer prices or because the need to secure copying permission sometimes imposes administrative costs that make it difficult for potential users of a copyrighted work to find its owner and strike a bargain. See W. Landes & R. Posner, The Economic Structure of Intellectual Property Law 68-70, 213-214 (2003). Consequently, the original British copyright statute, the Constitution’s Framers, and our case law all have recognized copyright’s resulting and necessary call for balance.
At the time the Framers wrote the Constitution, they were well aware of Britain’s 18th-century copyright statute, the Statute of Anne, 8 Anne, ch. 19 (1710), and they were aware of the legal struggles that produced it. That statute sought in part to control, and to limit, pre-existing monopolies that had emerged in the book trade as a result of the Crown’s having previously granted special privileges to royal favorites. The Crown, for example, had chartered the Stationers’ Company, permitting it to regulate and to censor *347 works on the government’s behalf. The Stationers had thereby acquired control over the disposition of copies of published works, from which emerged the Stationers’ copyright — a right conferred on company members, not authors, that was deemed to exist in. perpetuity. See L. Patterson, Copyright in Historical Perspective 1-16, 114-150 (1968) (hereinafter Patterson); Walterscheid 59-65; Gómez-Arostegui, The Untold Story of the First Copyright Suit Under the Statute of Anne in 1710, 25 Berkeley Tech. L. J. 1247, 1250-1256 (2010).
To prevent the continuation of the booksellers’ monopoly and to encourage authors to write new books, Parliament enacted the Statute of Anne. It bore the title: “An Act for the Encouragement of Learning, by vesting the Copies of printed Books in the Authors or Purchasers of such Copies, during the Times therein mentioned.” And it granted authors (not publishers) and their assignees the “sole Right and Liberty of printing” their works for limited periods of time in order to encourage them “to compose and write useful Books.” 8 Anne, ch. 19, § 1 (emphasis added). As one historian has put it: “The central plank of the . . . Act was ... a cultural quid pro quo. To encourage ‘learned Men to compose and write useful Books’ the state would provide a guaranteed, if temporally limited, right to print and reprint those works.” Deazley, The Myth of Copyright at Common Law, 62 Camb. L. J. 106, 108 (2003). At first, in their attempts to minimize their losses, the booksellers argued that authors had a perpetual common-law copyright in their works deriving from their natural rights as creators. But the House of Lords ultimately held in Donaldson v. Beckett, 1 Eng. Rep. 837 (1774), that the Statute of Anne had transformed any such perpetual common-law copyright into a copyright of a limited term designed to serve the public interest. Patterson 15-16, 153, 158-179; Deazley, supra, at 114-126.
Many early colonial copyright statutes, patterned after the Statute of Anne, also stated that copyright’s objective was *348 to encourage authors to produce new works and thereby improve learning. See U. S. Copyright Office, Copyright Enactments, Bulletin No. 3, pp. 1, 6, 10, 11, 17, 19 (rev. 1963) (statutes of Connecticut, New Jersey, Pennsylvania, South Carolina, Georgia, and New York); Walterscheid 74-75; Bra-cha, The Adventures of the Statute of Anne in the Land of Unlimited Possibilities: The Life of a Legal Transplant, 25 Berkeley Tech. L. J. 1427, 1444-1450 (2010).
At least, that was the predominant view expressed to, or by, the Founders. Patterson 93. Thomas Jefferson, for example, initially expressed great uncertainty as to whether the Constitution should authorize the grant of copyrights and patents at all, writing that “the benefit even of limited monopolies is too doubtful” to warrant anything other than their “suppression.” Letter from Thomas Jefferson to James Madison (July 31, 1788), in 13 Papers of Thomas Jefferson 440, 443 (J. Boyd ed. 1956). James Madison also thought that “Monopolies . . . are justly classed among the greatest nu[i]sances in Government.” Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), in 14 id., at 16, 21 (J. Boyd ed. 1958). But he argued that “in certain cases” such as copyright, monopolies should “be granted” (“with caution, and guarded with strictness agst abuse”) to serve as “compensation for a benefit actually gained to the community . . . which the owner might otherwise withhold from public use.” Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments., in J. Madison, Writings 756 (J. Rakove ed. 1999) (emphasis added). Jefferson eventually came to agree with Madison, supporting a limited conferral of monopoly rights but only “as an encouragement to men to pursue ideas which may produce utility.” Letter from Thomas Jefferson to Isaac McPherson (Aug. 13, 1813), in 6 Papers of Thomas Jefferson, at 379, 383 (J. Looney ed. 2009) (emphasis added).
This utilitarian view of copyrights and patents, embraced by Jefferson and Madison, stands in contrast to the “natural *349 rights” view underlying much of continental European copyright law — a view that the English booksellers promoted in an effort to limit their losses following the enactment of the Statute of Anne and that in part motivated the enactment of some of the colonial statutes. Patterson 158-179, 183-192. Premised on the idea that an author or inventor has an inherent right to the fruits of his labor, it mythically stems from a legendary 6th-century statement of King Diarmed “‘to every cow her calf, and accordingly to every book its copy.’ ” A. Birrell, Seven Lectures on the Law and History of Copyright in Books 42 (1899). That view, though perhaps reflected in the Court’s opinion, ante, at 334, runs contrary to the more utilitarian views that influenced the writing of our own Constitution’s Copyright Clause. See S. Ricketson, The Berne Convention for the Protection of Literary and Artistic Works: 1886-1986, pp. 5-6 (1987) (The first French copyright laws “placed authors’ rights on a more elevated basis than the Act of Anne had done,” on the understanding that they were “simply according formal recognition to what was already inherent in the ‘very nature of things’”); S. Stewart, International Copyright and Neighbouring Rights 6-7 (2d ed. 1989) (describing the European system of droit d’auteur).
This utilitarian understanding of the Copyright Clause has long been reflected in the Court’s case law. In Mazer, for example, the Court refers to copyright as embodying the view that “encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors.” 347 U. S., at 219 (emphasis added). In Twentieth Century Music Corp. v. Aiken, 422 U. S. 151 (1975), the Court says that underlying copyright is the understanding that “[cjreative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.” Id., at 156 (emphasis added). And in Sony Corp. of America v. Universal City *350 Studios, Inc., 464 U. S. 417 (1984), the Court, speaking of both copyrights and patents, points out that the “monopoly privileges that Congress may authorize are . .. [not] primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors ... by the provision of a special reward.” Id., at 429 (emphasis added); see also, e. g., Graham v. John Deere Co. of Kansas City, 383 U. S. 1, 6 (1966) (The “constitutional command ... ‘[to] promote the Progress [of Science]’... is the standard expressed in the Constitution and it may not be ignored”); Fox Film Corp. v. Doyal, 286 U. S. 123, 127 (1932) (“The sole interest of the United States . . . lie[s] in the general benefits derived by the public from the labors of authors”).
Congress has expressed similar views in congressional Reports on copyright legislation. Thus, for example, an 1892 House Report states:
“The object to be attained and the reason for the constitutional grant of power are imbedded in the grant itself. They are ‘to promote the progress of science and the useful arts.’... [The Clause says] nothing ... about any desire or purpose to secure to the author or inventor his ‘natural right to his property.’” H. R. Rep. No. 1494, 52d Cong., 1st Sess., 2.
Similarly, the congressional authors of the landmark 1909 Copyright Act wrote:
“The Constitution ... provides that Congress shall have the power to grant [copyrights] . . . [n]ot primarily for the benefit of the author, . . . but because the policy is believed to be for the benefit of the great body of people, in that it will stimulate writing and invention, to give some bonus to authors and inventors.” H. R. Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909).
*351 And they went on to say:
“Congress must consider . . . two questions: First, how much will the legislation stimulate the producer and so benefit the public; and, second, how much will the monopoly granted be detrimental to the public? The granting of such exclusive rights, under the proper terms and conditions, confers a benefit upon the public that outweighs the evils of the temporary monopoly.” Ibid.
The upshot is that text, history, and precedent demonstrate that the Copyright Clause places great value on the power of copyright to elicit new production. Congress in particular cases may determine that copyright’s ability to do so outweighs any concomitant high prices, administrative costs, and restrictions on dissemination. And when it does so, we must respect its judgment. See Eldred, 537 U. S., at 222. But does the Clause empower Congress to enact a statute that withdraws works from the public domain, brings about higher prices and costs, and in doing so seriously restricts dissemination, particularly to those who need it for scholarly, educational, or cultural purposes — all without providing any additional incentive for the production of new material? That is the question before us. And, as I have said, I believe the answer is no. Congress in this statute has exceeded what are, under any plausible reading of the Copyright Clause, its permissible limits.
J — i W
The Act before us says that it “restores” American copyright to a set of works, which, for the most part, did not previously enjoy American copyright protection. These works had fallen into America’s public domain, but as of the “restoration” date, they had not yet fallen into the public domain of the foreign country where they originated.
*352 The statute covers works originating almost anywhere outside the United States. See 17 U. S. C. § 104A(h)(3) (setting out eligibility criteria); U. S. Copyright Office, Circular No. 38A: International Copyright Relations of the United States (2010). The relevant set of works consists primarily of works originating abroad that did not obtain, or at some point lost, American copyright protection because (1) the author failed to comply with applicable American copyright formalities (such as notice or renewal), or (2) the nation in which they were first published then lacked copyright relations with the United States, or (3) they are sound recordings fixed before February 15, 1972. § 104A(h)(6)(C). A work must also satisfy other technical requirements: It must have had a rightholder who was a national or resident of an eligible country on the day it was created; and it cannot have been published in the United States within 30 days of its first publication. § 104A(h)(6)(D). The Act grants these works a copyright that expires at the time it would have expired had the author obtained a full American copyright term starting from the date on which the work was first published (in the foreign country). § 104A(a)(l)(B).
The Act mainly applies to works first published abroad between 1923 and 1989. It does not apply significantly to earlier works because any work published before 1921 would have fallen into the public domain before 1977 had it received a full American copyright term, while works published between 1921 and 1923 obtained a “restored” copyright that expired before the 1998 Sonny Bono Copyright Term Extension Act, and so could have lasted two years at most. See Tit. I, § 101, 90 Stat. 2574 (extending the copyright term of works still under copyright in 1977 to 75 years); 17 U. S. C. § 304(b) (extending the copyright term of works still under copyright in 1998 to 95 years). It has less impact on more recent works because in 1989 the United States became a Berne member, abolished the copyright notice requirement, and thenceforth provided prospective copyright protection *353 throughout the Berne Union. See R. Schechter & J. Thomas, Intellectual Property: The Law of Copyrights, Patents and Trademarks 75-77 (2003); §7, 102 Stat. 2857-2858 (codified as amended at 17 U. S. C. §§401-406).
Despite these temporal limitations, the Act covers vast numbers of works. The first category includes works published in countries that had copyright relations with the United States during this time period, such as most of Western Europe and Latin America, Australia, and Japan, see Circular No. 38A, at 2-10, whose authors did not satisfy American copyright formalities, perhaps because the author, who may not have sought an American copyright, published the book abroad without proper American notice, or perhaps because the author obtained a valid American copyright but failed to renew it.
The second category (works that entered the public domain due to a lack of copyright relations) includes, among others, all works published in Russia and other countries of the former Soviet Union before May 1973 (when the U. S. S. R. joined the Universal Copyright Convention (UCQ), all works published in the People’s Republic of China before March 1992 (when bilateral copyright relations between the People’s Republic and the United States were first established), all South Korean works published before October 1987 (when South Korea joined the UCC), and all Egyptian and Turkish works published before March 1989 (when the United States joined Berne). See id,, at 2-10, and 11, nn. 2, 5, 6.
The third category covers all sound recordings from eligible foreign countries published after February 15, 1972. The practical significance of federal copyright restoration to this category of works is less clear, since these works received, and continued to receive, copyright protection under state law. See 17 U. S. C. § 301(c).
Apparently there are no precise figures about the number of works the Act affects, but in 1996 the then-Register of *354 Copyrights, Marybeth Peters, thought that they “probably number in the millions.” The Year in Review: Accomplishments and Objectives of the U. S. Copyright Office, 7 Ford. Intellectual Property Media & Entertainment L. J. 25, 31 (1996).
A
The provision before us takes works from the public domain, at least as of January 1, 1996. See § 104A(h)(2)(A) (setting “restoration” dates). It then restricts the dissemination of those works in two ways.
First, “restored copyright” holders can now charge fees for works that consumers previously used for free. The price of a score of Shostakovich’s Preludes and Fugues Op. 87, for example, has risen by a multiple of seven. Brief for Conductors Guild et al. as Amici Curiae 11. And, as the Court recognizes, an orchestra that once could perform “Peter and the Wolf. . . free of charge” will now have to buy the “right to perform it ... in the marketplace.” Ante, at 333. But for the case of certain “derivative” works, § 104A(d)(3), the “restored copyright” holder, like other copyright holders, can charge what the market will bear. If a school orchestra or other nonprofit organization cannot afford the new charges, so be it. They will have to do without — aggravating the already serious problem of cultural education in the United States. See Brief for Conductors Guild et al. as Amici Curiae 4-5, 7-8 (describing the inability of many orchestras to pay for the rental of sheet music covered by “restored eopyright[s]”).
Second, and at least as important, the statute creates administrative costs, such as the costs of determining whether a work is the subject of a “restored copyright,” searching for a “restored copyright” holder, and negotiating a fee. Congress has tried to ease the administrative burden of contacting copyright holders and negotiating prices for those whom the statute calls “reliance parties],” namely those who previously had used such works when they were freely available *355 in the public domain. § 104A(h)(4). But Congress has done nothing to ease the administrative burden of securing permission from copyright owners that is placed upon those who want to use a work that they did not previously use, and this is a particular problem when it comes to “orphan works”— older and more obscure works with minimal commercial value that have copyright owners who are difficult or impossible to track down. Unusually high administrative costs threaten to limit severely the distribution and use of those works — works which, despite their characteristic lack of economic value, can prove culturally invaluable.
There are millions of such works. For example, according to European Union figures, there are 13 million orphan books in the European Union (13% of the total number of books in copyright there), 225,000 orphan films in European film archives, and 17 million orphan photographs in United Kingdom museums. A. Vuopala, Assessment of the Orphan Works Issue and Costs for Rights Clearance 19, 25 (2010), online at http://ec.europa.eu/information_society/activities/ digital_libraries/doc/reports_orphan/anna_report.pdf (all Internet materials as visited Jan. 13, 2012, and available in Clerk of Court’s ease file). How is a university, a film collector, a musician, a database compiler, or a scholar now to obtain permission to use any such lesser known foreign work previously in the American public domain? Consider the questions that any such individual, group, or institution usually must answer: Is the work eligible for restoration under the statute? If so, who now holds the copyright — the author? an heir? a publisher? an association? a long-lost cousin? Whom must we contact? What is the address? Suppose no one answers? How do we conduct a negotiation?
To find answers to these, and similar, questions costs money. The cost to the University of Michigan and the Institute of Museum and Library Services, for example, to determine the copyright status of books contained in the HathiTrust Digital Library that were published in the *356 United States from 1923 to 1963 will exceed $1 million. Brief for American Library Association et al. as Amici Curiae 15.
It is consequently not surprising to learn that the Los Angeles Public Library has been unable to make its collection of Mexican folk music publicly available because of problems locating copyright owners, that a Jewish cultural organization has abandoned similar efforts to make available Jewish cultural music and other materials, or that film preservers, museums, universities, scholars, database compilers, and others report that the administrative costs associated with trying to locate foreign copyright owners have forced them to curtail their cultural, scholarly, or other work-preserving efforts. See, e. g., Comments of the Library Copyright Alliance in Response to the U. S. Copyright Office’s Inquiry on Orphan Works 5 (Mar. 25, 2005), online at http://www.arl.org/bm~doc/lcacomment0305.pdf; Comments of Creative Commons and Save The Music in Response to the U. S. Copyright Office’s Inquiry on Orphan Works (Mar. 25, 2005), online at http://www.copyright.gov/ orphan/comments/OW0643-STM-CreativeCommons.pdf; General Agreement on Tariffs and Trade (GATT): Intellectual Property Provisions, Joint Hearing before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary and the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary, 103d Cong., 2d Sess., 131, 273 (1994) (hereinafter Joint Hearing) (statement of Larry Urbanski, Chairman of the Fairness in Copyright Coalition and President of Moviecraft, Inc.); Brief for American Library Association et al. as Amici Curiae 6-23; Brief for Creative Commons Corp. as Amicus Curiae 7-8; Brief for Project Petrucci, LLC, as Amicus Curiae 10-11.
These high administrative costs can prove counterproductive in another way. They will tempt some potential users to “steal” or “pirate” works rather than do without. And *357 piracy often begets piracy, breeding the destructive habit of taking copyrighted works without paying for them, even where payment is possible. Such habits ignore the critical role copyright plays in the creation of new works, while reflecting a false belief that new creation appears by magic without thought or hope of compensation.
B
I recognize that ordinary copyright protection also comes accompanied with dissemination-restricting royalty charges and administrative costs. But here the restrictions work special harm. For one thing, the foreign location of restored works means higher than ordinary administrative costs. For another, the statute’s technical requirements make it very difficult to establish whether a work has had its copyright restored by the statute. Gard, In the Trenches With § 104A: An Evaluation of the Parties’ Arguments in Golan v. Holder as It Heads to the Supreme Court, 64 Vand. L. Rev. En Banc 199, 216-220 (2011) (describing difficulties encountered in compiling the information necessary to create an online tool to determine whether the statute applies in any given case).
Worst of all, “restored copyright” protection removes material from the public domain. In doing so, it reverses the payment expectations of those who used, or intended to use, works that they thought belonged to them. Were Congress to act similarly with respect to well-established property rights, the problem would be obvious. This statute analogously restricts, and thereby diminishes, Americans’ preexisting freedom to use formerly public domain material in their expressive activities.
Thus, while the majority correctly observes that the dissemination-restricting harms of copyright normally present problems appropriate for legislation to resolve, ante, at 334-335, the question is whether the Copyright Clause permits Congress seriously to exacerbate such a problem by *358 taking works out of the public domain without a countervailing benefit. This question is appropriate for judicial resolution. Indeed, unlike Eldred where the Court had to decide a complicated line-drawing question — when is a copyright term too long? — here an easily administrable standard is available — a standard that would require works that have already fallen into the public domain to stay there.
The several, just mentioned features of the present statute are important, for they distinguish it from other copyright laws. By removing material from the public domain, the statute, in literal terms, “abridges” a pre-existing freedom to speak. In practical terms, members of the public might well have decided what to say, as well as when and how to say it, in part by reviewing with a view to repeating, expression that they reasonably believed was, or would be, freely available. Given these speech implications, it is not surprising that Congress has long sought to protect public domain material when revising the copyright laws. See infra, at 362 (listing instances). And this Court has assumed the particular importance of public domain material in roughly analogous circumstances. See Graham, 383 U. S., at 6 (“Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain”); Kewanee Oil Co. v. Bicron Corp., 416 U. S. 470, 484 (1974) (trade secret protection is not incompatible with “policy that matter once in the public domain must remain in the public domain”); Cox Broadcasting Corp. v. Cohn, 420 U. S. 469, 496 (1975) (First Amendment prohibits sanctioning press for publishing material disclosed in public court documents); see also Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U. S. 23, 33 (2003) (“The right to copy . . . once a copyright has expired . . . passes to the public” (internal quotation marks omitted)).
Moreover, whereas forward-looking copyright laws tend to benefit those whose identities are not yet known (the writer who has not yet written a book, the musician who has not *359 yet composed a song), when a copyright law is primarily backward looking the risk is greater that Congress is trying to help known beneficiaries at the expense of badly organized unknown users who find it difficult to argue and present their case to Congress. In Eldred, I thought this problem was severe. See generally 537 U. S., at 243-266 (dissenting opinion). And in light of the fact that Congress, with one minor exception, heard testimony only from the representatives of existing copyright holders, who hoped that passage of the statute would enable them to benefit from reciprocal treatment of American authors abroad, infra, at 364-365,1 cannot say that even here the problem, while much diminished, was nonexistent.
I agree with the majority that, in doing so, this statute does not discriminate among speakers based on their viewpoints or subject matter. Ante, at 330-331. But such considerations do not exhaust potential First Amendment problems. Cf. Sorrell v. IMS Health Inc., 564 U. S. 552, 566 (2011) (finding First Amendment problem in statute that prohibits drug manufacturers from using publicly available prescriber-identifying information in their marketing efforts in part because it “disfavor[ed] specific speakers”); Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 659 (1994) (“Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns”).
Taken together, these speech-related harms (e. g., restricting use of previously available material; reversing payment expectations; rewarding rent-seekers at the public’s expense) at least show the presence of a First Amendment interest. And that is enough. For present purposes, I need not decide whether the harms to that interest show a violation of the First Amendment. I need only point to the importance of interpreting the Constitution as a single document — a document that we should not read as setting the Copyright Clause and the First Amendment at cross- *360 purposes. Nor need I advocate the application here of strict or specially heightened review. I need only find that the First Amendment interest is important enough to require courts to scrutinize with some care the reasons claimed to justify the Act in order to determine whether they constitute reasonable copyright-related justifications for the serious harms, including speech-related harms, which the Act seems likely to impose.
C
1
This statute does not serve copyright’s traditional public ends, namely the creation of monetary awards that “motivate the creative activity of authors,” Sony, 464 U. S., at 429, “encourag[e] individual effort,” Mazer, 347 U. S., at 219, and thereby “serve the cause of promoting broad public availability of literature, music, and the other arts,” Twentieth Century Music, 422 U. S., at 156. The statute grants its “restored copyright[s]” only to works already produced. It provides no monetary incentive to produce anything new. Unlike other American copyright statutes from the time of the Founders onwards, including the statute at issue in Eldred, it lacks any significant copyright-related quid pro quo.
The majority seeks to avoid this awkward fact by referring to past congressional practice that mostly suggests that Congress may provide new or increased protection both to newly created and to previously created works. Ante, at 320-321, 323; Act of May 31, 1790, § 1,1 Stat. 124 (conferring its new federal copyright on new works as well as old); Act of July 3, 1832, § 3, 4 Stat. 559 (authorizing new patents for past and future inventors who inadvertently failed to comply with applicable statutory formalities); McClurg v. Kings-land, 1 How. 202 (1843) (applying an act deeming a past or future inventor’s patent valid despite it being briefly used by, for example, the inventor’s employer). I do not dispute *361 that copyright power. Insofar as such a statute does the former, i. e., extends protection to newly created material, it embodies copyright’s traditional justification — eliciting new production. And I do not doubt that Congress may then also include existing works within the scope of, say, increased protection for equitable and administrative reasons. See Eldred, 537 U. S., at 204, 214-215 (describing equitable reasons for applying newly extended copyright terms to future and existing copyrights alike). The statute before us,- however, does not directly elicit any new production. Compare id., at 204-208 (majority opinion) (noting that statute’s extended term would apply to newly created material, and finding that the determination of the likelihood of its eliciting new production in practice was a matter for Congress to determine), with id., at 243-267 (Breyer, J., dissenting) (expressing the view that there is little likelihood, in practice, that the statute would elicit new material). See also Walterscheid 219 (the 1790 Congress likely thought it was substituting federal protection for pre-existing state common-law protections); Maher, Copyright Term, Retrospective Extension, and the Copyright Law of 1790 in Historical Context, 49 J. Copyright Soc. USA 1021, 1023-1024, and n. 8 (2002) (numerical estimate suggesting that 1790 Act removed only a small number of books from public domain).
The other statutes to which the majority refers are private bills, statutes retroactively granting protection in wartime, or the like. Ante, at 320-323; Act of Feb. 19, 1849, ch. 57, 9 Stat. 763 (Levi Corson); Act of June 23,1874, ch. 534,18 Stat., pt. 3, p. 618 (Tod Helmuth); Act of Feb. 17, 1898, ch. 29, 30 Stat. 1396 (Judson Jones); Act of Dec. 18, 1919, ch. 11, 41 Stat. 368; Act of Sept. 25, 1941, ch. 421, 55 Stat. 732; see also Evans v. Jordan, 9 Cranch 199 (1815) (upholding a private bill restoring patent protection to a flour mill). But special circumstances, like wars, hurricanes, earthquakes, and other disasters, prevent the realization in practice of a reasonable expectation of securing or maintaining a pre-existing right. *362 Private bills are designed to provide special exceptions for comparable equitable reasons. See also Act of Mar. 3, 1893, ch. 215, 27 Stat. 743 (similar, as far as I can tell). To find in these laws an important analogy to the present law, which for the most part covers works that the author did not expect to protect in America (and often did not particularly want to protect), seems somewhat farfetched.
In fact, congressional practice shows the contrary. It consists of a virtually unbroken string of legislation preventing the withdrawal of works from the public domain. See, e. g., Berne Convention Implementation Act of 1988, §12, 102 Stat. 2860 (the Act “does not provide copyright protection for any work that is in the public domain in the United States”); Copyright Act of 1976, Tit. I, § 101, 90 Stat. 2573 (declining to extend copyright protection to any work that is in the public domain prior to the Act taking effect); Copyright Act of 1909, §7, 35 Stat. 1077 (“[N]o copyright shall subsist in the original text of any work which is in the public domain, or in any work which was published in this country or any foreign country prior to the going into effect of this Act and has not been already copyrighted in the United States”); Act to Amend the Several Acts Respecting Copy Rights §16, 4 Stat. 439 (the Act “shall not extend to any copyright heretofore secured, the term of which has already expired”); see also H. R. Rep. No. 1742, 87th Cong., 2d Sess., 3 (1962) (expressing concern that because “it is not possible to revive expired terms of copyright, it seems to the committee to be desirable to suspend further expiration of copyright for a period long enough to enable the working out of remaining obstacles to the overall revision of the copyright law”).
2
The majority makes several other arguments. First, it argues that the Clause does not require the “creation of at least one new work,” ante, at 325, but may instead “promote the Progress of Science” in other ways. And it specifically *363 mentions the “dissemination of existing and future works” as determinative here. Ante, at 324-327, and n. 25. The industry experts to whom the majority refers argue that copyright protection of already existing works can help, say, music publishers or film distributers raise prices, produce extra profits, and consequently lead them to publish or distribute works they might otherwise have ignored. But ordinarily a copyright — since it is a monopoly on copying— restricts dissemination of a work once produced compared to a competitive market. And simply making the industry richer does not mean that the industry, when it makes an ordinary forward-looking economic calculus, will distribute works not previously distributed. The industry experts might mean that temporary extra profits will lead them to invest in the development of a market, say, by advertising. But this kind of argument, which can be made by distribut-ers of all sorts of goods, ranging from kiwi fruit to Swedish furniture, has little if anything to do with the nonrepeatable costs of initial creation, which is the special concern of copyright protection. See supra, at 346.
Moreover, the argument proves too much. It is the kind of argument that the Stationers’ Company might well have made and which the British Parliament rejected. Cf. Patterson 154-155 (describing failed booksellers’ bill seeking protection from foreign competition through an extension of the copyright term). It is the kind of argument that could justify a legislature’s withdrawing from the public domain the works, say, of Hawthorne or of Swift or for that matter the King James Bible in order to encourage further publication of those works; and, it could even more easily justify similar action in the case of lesser known early works, perhaps those of the Venerable Bede. The Court has not, to my knowledge, previously accepted such a rationale — a rationale well removed from the special economic circumstances that surround the nonrepeatable costs of the initial creation of a “Writing.” Supra, at 346. And I fear that doing so would *364 read the Copyright Clause as if it were a blank cheek made out in favor of those who are not themselves creators.
It is not surprising that the copyright holders’ representatives who appeared before Congress did not emphasize this argument. (With one minor exception only those representatives appeared, see generally Joint Hearing; the Copyright Office did not testify, id., at 239.) Rather, they focused on the Berne Convention itself. By that time, Congress had already protected all new works of Berne members. But it had not provided additional protection to pre-existing foreign works that were then in the American public domain. Industry witnesses testified that withdrawing such works from the American public domain would permit foreign copyright owners to charge American consumers more for their products; and that, as a result, the United States would be able to persuade foreign countries to allow American holders of pre-existing copyrights to charge foreign customers more money for their products. See id., at 241 (statement of Eric Smith, Executive Director and General Counsel, International Intellectual Property Alliance) (“[F]ailure to [comply with Article 18] will... undermine the ability of the United States to press other countries to implement the same sort of protection in their implementing legislation currently pending in many legislatures around the globe”); id., at 253 (statement of Matt Gerson, Vice President for Congressional Affairs, Motion Picture Assn, of America) (similar). See also id., at 85 (statement of Xavier Becerra, House Judiciary Committee member) (“[Rjetroactivity ... is probably the best way to ensure that some of our older American works, anything from Motown, to ‘Star Trek,’ to ‘The Hardy Boys’ get the protection in some of these emerging foreign markets. It is important to ensure that countries no longer use our U. S. law as an excuse for not extending retroactive copyright protections to some of our own works”). But see id., at 272-279 (statement of Larry Urbanski, Chairman of the Fairness in Copyright Coalition and President of Moviecraft *365 Inc.) (testifying against restoration on grounds similar to those set out, supra, at 354-357).
This argument, whatever its intrinsic merits, is an argument that directly concerns a private benefit: how to obtain more money from the sales of existing products. It is not an argument about a public benefit, such as how to promote or to protect the creative process.
Third, the majority points out that the statute “gives [authors] nothing more than the benefit of their labors during whatever time remains before the normal copyright term expires.” Ante, at 334. But insofar as it suggests that copyright should in general help authors obtain greater monetary rewards than needed to elicit new works, it rests upon primarily European, but not American, copyright concepts. See supra, at 348-349.
Fourth, the majority argues that this statutory provision is necessary to fulfill our Berne Convention obligations. Ante, at 309-313. The Treaty, in Article 18, says that the “Convention shall apply to all works which, at the moment-of its coming into force [i. e., 1989 in the case of the United States] have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.” Berne Convention for the Protection of Literary and Artistic Works, Art. 18(1), Sept. 9, 1886, as revised at Stockholm on July 14, 1967, 828 U. N. T. S. 221, 251. The majority and Government say that this means we must protect the foreign works at issue here. And since the Berne Convention, taken as a whole, provides incentives for the creation of new works, I am willing to speculate, for argument’s sake, that the statute might indirectly encourage production of new works by making the United States’ place in the international copyright regime more secure.
Still, I cannot find this argument sufficient to save the statute. For one thing, this is a dilemma of the Government’s own making. The United States obtained the benefits of Berne for many years despite its failure to enact a statute *366 implementing Article 18. But in 1994, the United States and other nations signed the Agreement on Trade-Related Aspects of Intellectual Property Rights, which enabled signatories to use World Trade Organization dispute resolution mechanisms to complain about other members’ Berne Convention violations. And at that time the Government, although it successfully secured reservations protecting other special features of American copyright law, made no effort to secure a reservation permitting the United States to keep some or all restored works in the American public domain. Indeed, it made no effort to do so despite the fact that Article 18 explicitly authorizes countries to negotiate exceptions to the Article’s retroactivity principle. See Art. 18(3), ibid. (“The application of [the retroactivity] principle shall be subject to any provisions contained in special conventions to that effect existing or to be concluded between countries of the Union” (emphasis added)); Gervais, Golan v. Holder. A Look at the Constraints Imposed by the Berne Convention, 64 Vand. L. Rev. En Banc 147,151-152 (2011); Gard, 64 Vand. L. Rev. En Banc, at 206.
For another thing, the Convention does not require Congress to enact a statute that causes so much damage to public domain material. Article 18(3) also states that “the respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle.” 18 U. N. T. S., at 251 (emphasis added). Congress could have alleviated many of the costs that the statute imposes by, for example, creating forms of compulsory licensing, requiring “restored copyright” holders to provide necessary administrative information as a condition of protection, or insisting upon “reasonable royalties.” Cf. S. 2913, 110th Cong., 2d Sess. (2008) (legislation that would have limited judicial remedies against users of orphan works); H. R. 5889, 110th Cong., 2d Sess. (2008) (House version of same); American Society of Composers, Authors and Publishers, http://www.aseap.com/licensing/termsdefined.aspx (society of *367 music copyright owners offering blanket licenses that give users the unlimited right to perform any of its members’ songs for a fixed fee, thus reducing negotiation and enforcement costs).
To say this is not to criticize the Convention or our joining it. Rather, it is to argue that the other branches of Government should have tried to follow the Convention and in particular its provisions offering compliance flexibility. The fact that the statute has significant First Amendment costs is relevant in this respect, for that Amendment ordinarily requires courts to evaluate less restrictive, alternative possibilities. Doing so here reveals that neither Congress nor the Executive took advantage of less restrictive methods of compliance that the Convention itself provides. And that fact means that the Convention cannot provide the statute with a constitutionally sufficient justification that is otherwise lacking.
Ill
The fact that, by withdrawing material from the public domain, the statute inhibits an important pre-existing flow of information is sufficient, when combined with the other features of the statute that I have discussed, to convince me that the Copyright Clause, interpreted in the light of the First Amendment, does not authorize Congress to enact this statute.
I respectfully dissent from the Court’s contrary conclusion.